**WASSON & ASSOCIATES, INC.**
David B. Wasson Esq. (Bar No.137075)
1422 Edinger Ave. Suite 230
Tustin, CA 92780
Tel (714) 368-0000 / Fax (714) 368-0033
dwasson@wassonlawyers.com

**LOFTIN|BEDELL P.C.**
L. Sue Loftin, Esq. (SBN: 092016)
Ariel R. Bedell, Esq. (SBN: 228111)
2540 Gateway Road
Carlsbad, California 92009
Tel (760) 431-2111 / Fax (760) 842-0432
sue@loftinbedell.com
ariel@loftinbedell.com

Attorneys for Plaintiffs, KINGSLEY
MANAGEMENT CORP., a Utah
corporation, KMC CA Management, LLC,
a Utah limited liability company; COUNTRY
CLUB LAND - 098, L.P., a Utah limited partnership.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KINGSLEY MANAGEMENT CORP., a Utah corporation, KMC CA MANAGEMENT, LLC, a Utah limited liability company; and COUNTRY CLUB LAND - 098, L.P., a Utah limited partnership. | Case No. Judge: |
| | **COMPLAINT FOR:** |
| Plaintiffs, | **1)** **DECLARATORY RELIEF REGARDING CONFLICTS OF LAW – NEW ORDINANCE NS 3027** |
| v. | |
| CITY OF SANTA ANA, a municipal corporation, DOES 1-40, INCLUSIVE, | **2)** **DECLARATORY RELIEF REGARDING SUBSTANTIVE DUE PROCESS – NEW ORDINANCE NS 3027** |
| Defendants. | |

**3) THE NEW ORDINANCE IS AN UNCONSTITUTIONAL TAKING IN VIOLATION OF THE FIFTH AMENDMENT TO THE CONSTITUTION (42 U.S.C. §1983)**

Demand For Trial By Jury

Plaintiffs, KINGSLEY MANAGEMENT CORP., KMC CA MANAGEMENT, LLC; and COUNTRY CLUB LAND - 098, L.P. (collectively, "**Plaintiffs**"), for their Complaint against the Defendant, City of Santa Ana (hereafter "**Defendant**", "**City**" or "**Santa Ana**"), allege as follows:

## INTRODUCTION

1.     This Complaint is related to an action by these parties (Case Number 8:22-cv-00076)(Dkt. 2) ("**First Action**") filed by the Plaintiffs on January 14, 2022 (and pursuant to the amendment thereto, a First Amended Complaint was filed on March 4, 2022 (Dkt. 19)) challenging the City's concurrent and simultaneous adoption of two ordinances as of October 19, 2021: Ordinance NS-3009, commonly referred to as the Rent Stabilization Ordinance and Ordinance NS-3010, commonly referred to as the Just Cause Eviction Ordinance and collectively with the Rent Control Ordinance ("**the Original Ordinances**"). (Dkt. 19, ¶1) The Original Ordinances purportedly applied to all "Residential Rental Units" and mobilehome spaces in the City of Santa Ana, California (**"City"**).  *Id.* Before bringing legal action, the Plaintiffs formally challenged the Original Ordinances with the City by participation in the private and public processes available to the public.  (Dkt. 19, 18 ¶34, 19-20 ¶¶37-38).  Those efforts were summarily dismissed and/or received no response. *Id.*  Plaintiffs reluctantly filed an action seeking judicial intervention for the ultimate reform of the offensive parts of the Original Ordinances.

2.     The First Action was filed in federal district court based upon diversity jurisdiction.  (Dkt. 19, ¶13) The Plaintiffs had the right there, as here, to assert this challenge in this federal court. (Dkt. 19, ¶¶11-13)

3.      After the First Action was filed, but before the City was compelled to answer these challenges, the federal district court issued an Order Staying the Action pursuant to *Pullman* Abstention. ("**Stay Order**") (DKT. 34)

4.      After due consideration of the legal basis for Stay Order, and finally determining that *Pullman* Abstention may not be applicable to this particular case, on July 19, 2022, the Plaintiffs filed a Notice of Appeal with the Ninth Circuit Court of Appeal challenging the Stay Order. (Dkt. 35)

5.      After Plaintiffs filed the Notice of Appeal but before the disposition of the appeal, the City adopted the "City of Santa Ana Rent Stabilization and Just Cause Eviction Ordinance" on October 18, 2022.  *See* Ordinance No. NS-3027 at 43 ("**New Ordinance**") (a copy of this ordinance is attached hereto as Exhibit "A".)

6.      Plaintiffs are informed and believe and thereon allege, that the New Ordinance was enacted, in substantial part, for the purpose of reforming the defects in the Original Ordinances as challenged in the First Action.  (Ord. No. NS-3027 attached hereto as **<u>Exhibit "A"</u>**)

7.      By way of example, Plaintiffs challenged the Original Ordinance as being preempted by specific state laws relating to mobilehome parks – the New Ordinance includes express and clear language that confirms the preemptive nature of such state laws.

8.      The New Ordinance rested on many of the same flawed assumptions set forth in the Original Ordinances. *See* Ord. No. NS-3027, § 1.C ("The findings in Ordinance No. NS-3009 ("Rent Stabilization Ordinance") and Ordinance No. NS-3010 ("Just Cause Ordinance") articulate that significant rent increases and housing instability pose a threat to public health, safety and welfare, and a particular hardship for senior citizens, persons living on fixed incomes, and other vulnerable persons living in Santa Ana.  These findings are still true and incorporated herein.") These conclusionary allegations did not provide the factual support for the adoption of the Original Ordinances and none was presented at the adoption of the New

Ordinance, particularly as applied to mobilehome owners and residents. (*See,* Dkt. 19, 16 ¶ 44) Notwithstanding communications in opposition to the passage of the **New Ordinance**, as applied to mobilehome spaces and parks, it was passed on the consent calendar. (*See,* City Council Agenda, October 18, 2022).

9.      To the extent necessary and as more fully set forth below, the Plaintiffs incorporate by this reference the allegations set forth in the First Action. (Dkt. 19)

10.     After the adoption of the Original Ordinances, the City set staff to create a Long-Term Implementation Plan to implement the Original Ordinances.

11.     The New Ordinance was intended to be adopted consistent with the Long-Term Implementation Plan and for the purpose of correcting substantial legal issues of the Original Ordinances (as said issues were raised by the Plaintiffs in the First Action and through public comments), and to provide further procedural requirements and obligations for landlords within the City.

12.     By its terms, the New Ordinance applies to all residential real property, mobilehome spaces and owners thereof; however, the issues and causes of action asserted and alleged herein are related only to the impact of the New Ordinance on the ownership, management, maintenance, and landlord/tenant relationships within mobile/manufacture home parks ("**mobilehome parks**").

13.     The Plaintiffs own and manage, as defined in California Civil Code, section 798.2, mobilehome parks including the Country Club Mobile Home Park ("**Park**" as defined in California Civil Code, sections 798.4 and 798.6; California Health & Safety Code sections 18210.7; 18214; 18214.2) in the City of Santa Ana, California. The Park was constructed prior to 1990. The Park is operated pursuant to a Permit to Operate issued by and under the jurisdiction of the California Department of Housing and Community Development ("**HCD**").

14.     The interest in the Park (and the other mobilehome parks managed by Plaintiffs) was acquired by Plaintiffs prior to the adoption of the Original Ordinance and the New Ordinance, as investment properties, and with no knowledge or

reasonable expectations of or for the enactment of any type of future rent control.

15.    The Plaintiffs own the land and common area improvements comprising the Park and rent individual spaces within the Park to homeowners (commonly referred to as "tenants") for the placement of the homeowner's personal property mobile/manufactured home upon the space (commonly known as a "lot").

16.    The Plaintiffs do not own or rent out the mobile/manufactured home (i.e. the dwelling unit) located within the Park to residents; but rather rent land upon which residents place their personal property mobile/manufactured home. Plaintiffs are not responsible for the condition, maintenance, repair, rehabilitation, among similar acts, of the personal property mobilehome, the accessory structures, the space and any other tenant improvements located on the space.

17.    The tenancy of each homeowner and resident within the mobilehomes is subject to the statutory requirements of the Mobilehome Residency Law, California Civil Code sections, 798 *et seq.* ("**MRL**").

18.    In a mobilehome park (i) the business relationship between the Park and the homeowners, including without limitation, the creation of the tenancy, rental/lease agreement requirements and terms, termination of tenancy, notice requirements, subleasing, approval of prospective tenants, guests, caregivers, is governed, exclusively by the MRL (where the MRL provides regulations thereof); and (ii) the maintenance and   the condition of the mobilehomes are the responsibility of the homeowners as the owner of the mobilehome, including, but not limited to, the construction, condition, maintenance, rehabilitation, and similar acts related thereto, and are the exclusive jurisdiction of the State of California, Department of Housing and Community Development pursuant to the Manufactured Housing Act, California Health and Safety Code), sections 18000 *et seq.* ("**MHA**" or "**Manufactured Housing Act**"), specifically California Health & Safety Code,  section 18015; the Mobilehome Parks Act, California Health and Safety Code, sections 18200 *et seq.* ("**MPA**"), specifically California Health &

Safety Code section 18300 and the California Code of Regulations, Title 25, sections 1000 *et seq* ("**Title 25**")*,* among other similar state mandatory statutory laws and regulations; National Manufactured Housing Construction and Safety Standards Act of 1974 ("**NMHC**") 42 U.S.C. sections. 5401 *et seq.;* Code of Federal Regulations Title 24, sections 3282.1 *et seq.,* and other Federal Building Codes related to the construction of mobile/manufactured homes and related matters.

19.    Consistent with the allegations set forth in the First Action, the challenges asserted in this Complaint do not seek to challenge the general legal precedent that a local jurisdiction (City of Santa Ana) may enact lawful, constitutional rent control laws (ordinances) that meet all constitutional standards because the MRL is conspicuously silent on the issue of the amount of rent a park owner may charge and thus the state laws allow local jurisdictions to enact rent controls. Cal. Civ. Code §§ 798.17; 798.21; 798.45.  Notwithstanding, the Plaintiffs are informed and believe and hereafter allege that the City failed to meet the necessary constitutional standards and its efforts were not in compliance with other statutory and legal requirements necessary for the lawful enactment of the Original Ordinances.

20.    The gravamen of the allegations set forth herein relate to the (i) the continued vagueness and inherent conflicts between New Ordinance and state laws and regulations relating to tenancies in mobilehome parks; (ii) the unconstitutional design of the means for the implementation of the New Ordinance resulting in a deprivation of the Plaintiffs' due process rights; and (iii) that the adoption of the Original Ordinance constituted a takings which was effective on the date of the adoption of the Original Ordinance and resolved upon the adoption of the New Ordinance.

21.    Plaintiffs contend and assert that the New Ordinance, on its face and Defendant's enforcement thereof, violate Plaintiffs' civil rights and constitutional

rights. Further, the Original Ordinance, upon its adoption, constitutes an uncompensated taking of private property in violation of the Fifth Amendment to the United States Constitution, entitling Plaintiffs to recover just compensation shown according to proof at the time of trial in an amount that exceeds in excess of $75,000.00.

22.   Plaintiffs further seek relief from the Court for the City's adoption of the New Ordinance, or portions thereof preempted by virtue of the direct conflict with general laws, vague by virtue of unclear, conflicting provisions within the New Ordinance and conflicting provisions with statutory laws, which conflicts render any reasonable person unable to comply or may not comply with the New Ordinance without violating state statutes, thereby subjecting the Plaintiffs to potential administrative citations and criminal charges, and renders the New Ordinance unconstitutional as applicable to mobilehome parks, in the form of injunctive relief, declaratory relief and compensatory damages, shown according to proof at the time of trial in an amount that exceeds $75,000.00.

## JURISDICTION AND VENUE

23.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because the action arises under 42 U.S.C. §1983 in relation to Defendants' deprivation of Plaintiffs' constitutional rights under the Fifth and Fourteenth Amendments to the United States Constitution.

24.   This Court has the authority to grant the requested declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202, implemented through Rule 57 of the Federal Rules of Civil Procedure.   This Court is also authorized to grant injunctive relief and damages under 28 U.S.C. §1343, pursuant to Rule 65 of the Federal Rules of Civil Procedure, and reasonable attorney's fees and costs under 42 U.S.C.§1988.

25.   This Court has subject matter jurisdiction under 28 U.S.C. §1332, which confers original jurisdiction over "all civil actions where the matter in

controversy exceeds the sum or value of $75,000, exclusive of interest and costs and is between …citizens of different States."  The amount in controversy exceeds $75,000.00, the jurisdictional amount, exclusive of costs and interest.

26.  Additionally, there is complete diversity between all of the plaintiffs and the City.  The Plaintiffs, and each of them, are residents of and/or are doing business in the State of Utah.  The City is a duly incorporated municipal corporation, existing under the law of the State of California.

27.  The Central District of California is the appropriate venue for this Action pursuant to 28. U.S.C. § 1391(b)(1) and (2), because it is in this District that the Defendant resides, maintain offices, exercise their authority in their official capacities and has, in fact, enacted the ordinances forming the subject of this Action.

## PARTIES

28.  Plaintiff, COUNTRY CLUB LAND - 098, L.P., is now, and at all times relevant to these proceedings and the allegations, assertions and claims in this Complaint, has been a Utah limited partnership, owning a mobilehome park in California commonly known as "Country Club Mobile Home Park."  The principal executive offices of the owner of the County Club Mobile Home Park are located in Provo, Utah.  For purposes of the jurisdiction of this Court, Manager, KMC CA Management LLC and the partners reside or have their principal place of business in the State of Utah.

29.  Plaintiff, KMC CA MANAGEMENT, LLC, is now, and at all times relevant to this Complaint has been, a Utah limited liability company, and serves as the General Partner of COUNTRY CLUB LAND - 098, L.P.  The principal executive offices of this limited liability company are located in Provo, Utah and the Manager/Managing Member and members reside or have their principal offices in the State of Utah.

30.  Plaintiff, KINGSLEY MANAGEMENT CORP., is now, at all times relevant to this Complaint, and has been a Utah corporation, and is the Manager of

KMC CA MANAGEMENT, LLC, and is the manager of Country Club Mobile Home Park. The principal place of business of this corporation is in Provo, Utah and the shareholders and principal officers reside or have their principal place of business is in the State of Utah.  KINGSLEY MANAGEMENT CORP together with KMC CA MANAGEMENT, LLC are referred to in this complaint as "Kingsley" and together with COUNTRY CLUB LAND - 098, L.P., as "Plaintiffs".

31.    Plaintiffs are informed and believe and thereupon allege, that Defendant, CITY OF SANTA ANA is, and at all times mentioned herein was, a duly incorporated municipal corporation, existing under the law of the State of California, and located within the State of California, in the County of Orange ("**City**").

32.    Plaintiffs do not know the true names and capacities of Defendants Does 1-40, inclusive, and therefore sue these individuals, corporations, public entities, governments, elected and appointed officials, staff, employees, contractors, and others by their fictitious names.  Plaintiffs allege that Defendants Does 1-40, inclusive, are jointly, severally and/or concurrently liable and responsible for the injuries set forth herein, acting on their own or as the agents and/or representatives of the named Defendants.   Accordingly, Plaintiffs will move to amend this Complaint to insert the true names of the fictitiously named Defendants at the time these Doe Defendants are ascertained.

33.    Plaintiffs are informed and believe and thereon allege that each Defendant, and each of them, was the agent and/or employee of every other Defendant, and at all times relevant herein, was acting within the course and scope of said agency and/or employment.  Further, Plaintiffs are informed and believe, and based thereon alleges, that Defendants, and each of them, may have conspired and acted in concert with each other with respect to the events and happenings referred to herein which proximately caused the harm and damage to Plaintiffs.

///

///

## FACTUAL BACKGROUND AND ALLEGATIONS
## COMMON TO ALL CLAIMS

34.     Plaintiffs are informed and believe and thereupon incorporate by this reference the allegations more fully set forth in the First Action pertaining to the City's failure to adequately investigate, consult with experts, hold open and adequate hearings, and comply with the fundamental constitutional standards governing these types of proceedings before enacting these Ordinances. (Dkt. 19 ¶¶ 22-24).

35.     Plaintiffs are informed and believe and thereon allege that the purported primary purpose of the New Ordinance was to further the purposes set forth in the Original Ordinance and to incorporate the recommendations and findings of staff through its Long-Term Implementation Plan.

36.     The Original Ordinance, and by extension thereof, the New Ordinance serves two primary purposes: to restrict the termination of tenancies within Residential Real Property (subject to exceptions) and to prohibit increases in rent on residential real property or mobilehome spaces in excess of "three percent (3%) or eighty (80%) of the change in the Consumer Price Index, *whichever is less*." New Ordinance, ¶¶ 8-3120 and 8-3140.

37.     The New Ordinance further sets out that the City will set forth annually the maximum allowable rent increase per year commencing in June, 2022. Another purpose of the New Ordinance is for the City to control the relationship between the tenants and park owners by requiring adherence to mandatory requirements for tenant notices, content of rental agreements, building code standards, all of which directly conflict with the plain meaning of other statutes which completely occupy those areas of law.

38.     Additionally, rent control provisions of the Original Ordinance created a flawed process for petitioning the City for increases in rent that effectively deprived the owners of a reasonable and realistic means to petition the City for these

increases. *Kavanau v. Santa Monica Rent Control Board,* (1997) 16 Cal. 4th 761. Finally, as compliance with the New Ordinance's mandatory requirements for tenant notices, content of rental agreements, and building code standards is required to receive the maximum allowed increase in rent or discretionary increases in rent required to receive a fair return, the New Ordinance's regulations that are preempted by state and federal law but not clearly provided for in the New Ordinance, the preemptive effect is to effectively deprive landlords of a fair return and therefore constitutes an unconstitutional taking.

39.    The Plaintiffs allege, on information and belief, that although the City had the right to enact Rent Control Ordinances, the invidious designs of these procedures and processes were purposefully intended to prevent the owners from effectively obtaining a fair return on their investment.  The Original Ordinance created a labyrinth through an elaborate petition process so complicated and complex to effectively deny the owners their constitutional due process rights, with the intention of  replacing existing statutory law in order to obtain control of the overall rental relationship between the Park and the tenants, or set up a process governed by a biased Rent Review Board in the New Ordinance, and provide an enforcement mechanism against the Park in the form of potential criminal actions while excusing the tenant from compliance with no similar enforcement action as set forth herein.

40.    As amended, restated and heavily modified by the New Ordinance, the City's rent control regulations are now governed by a Rent Review Commission consisting of an unequal and unbalanced board that is, by its design, biased against landlords as a result of the inclusion of more tenant representatives (expressly including one from mobilehome parks), than landlord representatives (and without any express inclusion of a mobilehome park owner/operator).

///

///

41.     The Plaintiffs are informed and believe and thereupon allege that the specific provisions of the New Ordinance are in conflict with California state law and Federal law as well as the MRL, except where silent as with the amount of rent; the Mobilehome Parks Act, the Manufactured Housing Act, and related California regulations; and the NMHC, and related federal statutes and regulations, control the mobilehome park and mobilehomes to the exclusion of local jurisdictions.

42.     The Plaintiffs are informed and believe and thereupon allege that the specific provisions of the New Ordinance create an unreasonable restriction on alienation of a park by requiring a report to be provided to the tenants, and filed with the City, in the event one owner of a rental mobilehome park sells the park to another owner. Such a sale, in and of itself, has no relationship to the landlord-tenant relationships; leases continue in the same fashion as before, as a matter of law, without regard to sale of the underlying fee interest. Accordingly, this regulation is irrational and arbitrary, and serves only to frustrate and delay lawful sales of rental property.

43.     The New Ordinance places severe limitations on the Plaintiffs' ability to increase rents, including the ability to increase rents upon termination of an existing tenant's tenancy (i.e. upon turn-over of a tenancy), "unless [the tenancy is] expressly exempt under the Costa-Hawkins Rental Housing Act codified in Cal. Civ. Code § 1954.50, *et seq*., or the MRL codified in Cal. Civ. Code sections 798, *et seq*." New Ordinance, Section 8-3140(a). As the Costa-Hawkins Act does not apply to mobilehome parks, the New Ordinance limits Plaintiffs' "maximum annual adjustment of residential real property or mobilehome space rent of up to three percent (3%) or eighty (80%) of the change in the Consumer Price Index, whichever is less" (but at the amount set annually by the City) apparently without regard to change of ownership or occupancy of a mobilehome or a space otherwise becoming vacant.

///

44.     The City, however, provides statements in various pleadings in connection with the First Action, on its website and to owners/operators/managers of mobilehome parks that the New Ordinance (and the Original Ordinance) does not regulate the rents upon a turn-over of the tenancy.  These statements create a conflict with the express language potentially subjecting a mobilehome park landlord to unintentional noncompliance with the New Ordinance and thereby facing various remedies including administrative citation, misdemeanor or infraction citations, civil actions, injunctive relief or nuisance claims. (New Ordinance, Section 8-3200).

45.     The effect of the rent control provisions of the New Ordinance, as it applies to these Plaintiffs, may allow a tenant within a mobilehome park to sell their personal property mobilehome, as well as a right to sell or transfer an interest in Plaintiffs' land, by selling the right to occupy the land at rents that are below market rate, commonly known as "Vacancy Control." These, among other similar rental events, are not listed as exceptions to the restrictions on the amount of the rent increase.  Notwithstanding the foregoing, the New Ordinance appears to be silent as to whether a mobilehome park constructed before 1990 can increase the rent to a new purchaser of a mobilehome and tenant in the Park, or to a new occupant of a previously occupied space that became vacant for whatever reason.  The silence could also be deemed permission to increase rent under the general Vacancy Control concepts.  Plaintiffs request Declaratory Relief for a determination of whether the Rent Control imposes or does not impose rent control on space turnover events.

46.     Based on information and belief, jurisdictions with rent control restrictions (where Vacancy Control legislation went unchallenged at adoption), saw mobilehomes sold at multiples above and beyond their "blue book" value and above and beyond values in non-rent controlled jurisdictions—despite that mobilehomes are technically a depreciating personal property asset which must

**PAGE 13**
PLAINTIFFS' COMPLAINT – CONSTITUTIONAL LAW

Complaint Page 13 of 76

eventually be replaced, thereby transferring the value of the real property of the Park to the personal property of the homeowners who reside in the Park at the inception of the rent control ordinance, and growing in the years that follow.

47.    The City's alleged authority to enact the New Ordinance rests on the City's police power, pursuant to Article XI of the California Constitution, and Section 200 of the Santa Ana Charter, as an ordinance and regulation for the public peace, health, and welfare of the City and its residents. See Original Ordinance, No. 3009, Findings section 1.P; Original Ordinance No. 3010, Finding section 1.O; and New Ordinance, NS-3027, Findings Section 1.H.  Plaintiffs contend a statement of "police power" does not validate or justify the legally objectionable provisions of the New Ordinance or the process used to enact them.

48.    The New Ordinance further incorporated all findings as set forth in the Original Ordinance which included the City's power to "establish standards for the development of mobilehome parks as a type of multiple-family residential development… to be compatible with the Housing Element of the City's General Plan." Original Ordinance No. NS-3009. The City's power to establish standards for the development of new and/or existing mobilehome parks and placement of mobilehomes on residential lots is limited under the MPA, California Health & Safety Code, section 18300(g), and the power to establish standards for an existing mobilehome structure is prohibited by the MPA as set forth above and the power to establish building standards for mobilehome parks and mobilehomes is prohibited by the MPA, MHA and other statutes.

49.    The New Ordinances, are penal statutes in that:

> "[i]t shall be unlawful for any person to violate or fail to comply with any provision of the ordinance. The violation of any provision of this ordinance shall first be punished through the use of an administrative citation, as provided in Santa Ana Municipal Code section 1- 21, et seq., prior to prosecution as a

misdemeanor or infraction, as provided in Santa Ana Municipal

Code section 1- 8."

These sections constitute the sole notice of the penal nature of these Ordinances and the sole guideline for compliance both the notice and the guidelines are insufficient to provide definiteness that ordinary people can understand for the reasons set forth hereinafter and minimum guidelines.

## FIRST CAUSE OF ACTION

### Declaratory Relief Regarding New Ordinance NS 3027 – Conflicts of Law and Vagueness

#### (*By Plaintiffs against All Defendants*)

50.    Plaintiffs incorporate herein by reference as though fully set forth herein the allegations contained in paragraphs 1 through 48 inclusive.

51.    Existing California law requires a business owner, including a landlord, "who negotiates primarily in Spanish, Chinese, Tagalong, Vietnamese, or Korean, orally or in writing…" to deliver the contract or agreement translated into such language. California Civil Code § 1632(b). Existing law only requires a translation of the agreement and further notices relating to such agreement when and to the extent the landlord negotiates the initial terms and conditions of such agreement in the foreign language. *Id.*

52.    The New Ordinance conflicts with such existing state law. The New Ordinance prohibits an owner of rental property, including a mobilehome space, from "providing false written or verbal information" and expressly provides that "false information includes…requesting or demanding a Tenant (A) Sign a new Rental Agreement not in the Tenant's primary language if..." one of three alternative requirements are met, including if the "Owner is otherwise aware that the new Rental Agreement is not in Tenant's primary language." *Id.*  Regardless of whether the landlord negotiates the initial terms and conditions of the rental agreement in English, the New Ordinance places the expensive and exhaustive

1  requirement to have every new rental agreement translated which therein will
2  require every notice ever served upon a tenant to be translated or face being in
3  violation with the New Ordinance.

4      53.    The MRL and California Code of Civil Procedure sets forth the
5  grounds for termination of tenancies, the manner of notices, services of notices and
6  viable defenses for an eviction action. When terminating tenancies in a mobilehome
7  park, California Civil Code §§ 798.55, 798.56 and 798.57 provide the express and
8  exclusive grounds for eviction, the content of the notice and the manner in which
9  the notice shall be served. California Code of Civil Procedure §§1159 et seq.
10 governs the content, notice and service of a termination notice for standard rental
11 tenancies, and governs the content and service of an eviction action within the
12 courts, including viable affirmative defenses that can be raised.

13     54.    The New Ordinance conflicts with the forgoing eviction laws by a
14 tenant with a "complete affirmative defense in an unlawful detainer action" based
15 on the landlords failure to comply with "any requirement" of the New Ordinance,
16 regardless if such failure is due to mistake, is unrelated to the eviction action at
17 hand, is not material or is due to inability to comply due to the City's processes for
18 compliance not yet being in place.   New Ordinance Section 8-3200(d). This
19 additional complete affirmative defense conflicts with existing statutes and is
20 preempted by the MRL.

21     55.    The New Ordinance includes the requirement that "[a]t lease sixty (60)
22 days prior to the sale of a Mobilehome Park, the Owner shall provide notice of such
23 proposed sale to the Mobilehome Park residents and prepare a report on the impact
24 of the sale of the Mobilehome Park, including a replacement and relocation plan
25 that adequately mitigates the impact upon the ability of any displaced residents of
26 the Mobilehome Park to be sold to find adequate housing in a Mobilehome Park, as
27 applicable." (New Ordinance, Section 8-3120(i)).
28 ///

56.     The New Ordinance requires the impact report regardless of whether the mobilehome park will be sold to a new owner who will maintain the community as a rental mobilehome park causing no displacement or relocation of the residents of said mobilehome park.

57.     Further, the New Ordinance requires that "[a]ny notices or documents required to be provided from a landlord to a Tenant by [the New Ordinance]…shall be provided to the City through the Rental Registry portal." New Ordinance, Section 8-3148 (emphasis added). Any report provided to the residents upon the sale of a mobilehome park will further be required to be provided to the City, thereby subjecting the sale to public records disclosures, potential City Council hearings and what was otherwise a private transaction between two parties, is now a public transaction subject to scrutiny by the City Council, potential public hearings and thereby causing an unreasonable restraint on the alienation of a mobilehome park.

58.     Section 8-3120(i) is contrary to and preempted by the MRL provision relating to the sale of mobilehome parks. Cal. Civ. Code section 798.80 requires a notice only to residents of a proposed park sale and only upon satisfaction of specific conditions and requirements; and does not also then impose a heavy administrative burden upon a selling park owner which is not reasonably connected to the facts of a change in ownership of the mobilehome park.

59.     The impact of the City requiring such an impact report is to unreasonably burden and restrict a change of ownership of a rental mobilehome park, require confidential information to be disclosed to the City and to hold a selling mobilehome park owner potentially liable for actions and decisions of a subsequent owner.

60.     The City has taken a final action, as of the adoption of the New Ordinances which is so vague or creates internal inconsistencies, that it fails to give ordinary people fair notice of the conduct it regulates and/or punishes, or so devoid

of clarity that it invites arbitrary and discriminatory enforcement.

61.    The New Ordinance expressly prohibits increases in rent "on Residential Real Property or Mobilehome Spaces" and provides two broad exceptions to the prohibition: (i) exemptions provided under the Costa-Hawkins Rental Housing Act (California Civil Code § 1954.50 *et seq.*) and (ii) exemptions from local rent control regulations under the MRL. As stated in the express language of the New Ordinance, the New Ordinance regulates the rents on the particular property, not a tenancy.

62.    Based on information and belief, the Costa-Hawkins Rental Housing Act requires vacancy decontrol—which means landlords must be allowed to increase rents to market rate at the expiration of a tenancy or vacancy. However, by its own definitions, Costa-Hawkins Rental Housing Act does not apply to mobilehome parks in that it regulates an "Owner" defined expressly to exclude "the owner or operator of a mobilehome park, or the owner of a mobilehome or his or her agent" and "residential real property" being the "dwelling or unit that is intended for human habitation." Cal. Civ. Code, section 1954.51(b) and (d). Mobilehome parks lack a dwelling, or unit as that term is used in the Costa-Hawkins Rental Housing Act, as the dwelling or unit is owned by the individual homeowner and not the owner of the mobilehome park.

63.    The MRL provides exemptions from local rent control for existing tenancies if certain conditions are met such as certain long-term leases are in place, the mobilehome is not the primary residence of the homeowner, or the community was built after January 1, 1990; but the MRL does not include any language relating to vacancy control or vacancy decontrol.

64.    Accordingly, the City provided traditional residential real property owners with relief from rent control at the end of a tenancy, through citation to the Costa-Hawkins Rental Housing Act, but erroneously (or intentionally) failed to provide mobilehome parks the same protection—meaning mobilehome park

owners are, potentially, prevented from raising rents after a tenant moves out. This "Vacancy Control" is uniquely problematic in mobilehome parks, because mobilehome owner tenants sell their homes when ending their tenancy—and thus can capture the value of below market rent, in charging an above market price for their home.

65.    Separately, the City apparently interprets the New Ordinance to only regulate existing leases but not impacting the rent increases upon a turn-over of the tenancy (i.e. vacancy decontrol) as applied to all tenancies within the City, whether for a traditional residential real property or a mobilehome space.

66.    The City asserts in pleadings in connection with the First Action that "However, the [rent control provisions of the Original Ordinance] does not specifically reference the amount of rent that may be charged to a new tenant. Rather, the [rent control provisions of the Original Ordinance] only restricts the amount and number of annual rent increases." (Dkt. 22, p18-8-10). Further, the City has informed various mobilehome park agents and representatives that the New Ordinance (and Original Ordinance) does not regulate rents upon turnover of the tenancy. The inconsistency between statements from the City and the language in the New Ordinance (which language is identical to that in the Original Ordinance) creates vagueness, confusion, and impossibility of compliance.

67.    The New Ordinance provides that "[n]o rent increase shall take effect for any Rental Unit unless the Landlord has accurately completed the Rental Unit Registry" (Section 8-3148(d)) but at the time of the adoption of the New Ordinance, the Renal Registry is not anticipated to be available or a requirement until July 1, 2023 (or as modified by resolution of the City Council (Section 8-3160). On the one hand, the City purports to prohibit rent increases unless and until a registry is completed by the landlord; but on the other, does not have the registry available at the time of the adoption making it vague and unclear whether a rent increase passed prior to the implantation of the Rental Registry that was otherwise passed in

accordance with the Original Ordinance and/or the New Ordinance is invalid as a result of the City not yet having the registry available.

68.     The New Ordinance includes the requirement that "[a]ny notices or documents required to be provided from a Landlord to a Tenant by this Article or any other federal, state or local law, including but not limited to, notice of Rent Increase and notice of eviction, shall be provided to the City through the Rental Registry Portal." (Section 8-3160(i)). This provision is overly broad and vague and requires any notice, not only notices relating to terminations, but ones which are given for unrelated reasons, such as notices for inspections, entry, repairs, temporary utility shut-offs, violations of rules, notices regarding domestic abuse victims' rights, notices regarding victim of crimes/stalking etc. rights, and annual disclosures that may be required.

69.     As all documents submitted to a governmental agency are subject to public disclosure requirements, the City's requirement of all documents and notices sent to tenants now be submitted to the City opens up for full public disclosure substantially private information about tenancies, occupants, potential tenant violations and victims of various crimes.

70.     The New Ordinance provides that a landlord's failure to "comply with any requirement of [the New Ordinance] may be asserted as a complete affirmative defense" by the tenant in any eviction action filed by a landlord. (Section 8-3200(d)). As the New Ordinance includes provisions which (i) are vague and ambiguous as to their application or interpretation; (ii) are impossible to comply with until the City has completed its Rental Registry process anticipated in summer 2023; and (iii) is so overly broad and burdensome as to make full compliance nearly impossible, it has placed an unreasonable bar on a landlord from being able to effectively complete and otherwise valid and legal eviction action.

///

///

## SECOND CAUSE OF ACTION

**Declaratory Relief Regarding Due Process - New Ordinance NS 3027**

**Fourteenth Amendment to the U.S. Constitution, and 42 U.S.C. Sec. 1983**

**(*By Plaintiffs against All Defendants*)**

71.    Plaintiffs refer to, repeat, and incorporate herein by reference as though fully set forth at length the allegations contained in paragraphs 1 through 70.

72.    Plaintiffs are informed and believe and thereon allege, that an actual controversy has arisen and now exists between Plaintiff and City.

73.    On September 6, 2022, City Council adopted a Long-Term Implementation Plan for the purposes of implementing the Original Ordinances which included adopting amendments, restatements, incorporations, and full replacements thereof by the New Ordinance.

74.    Approximately a month later, on October 4, 2022, the City Council considered replacing the fiat control of rental adjustments by the City Manager, with a rental housing board, apparently with the intention of responding to the First Action and correspondences at open forums from the Plaintiffs and to complying with *Kavanau,* 16 Cal. 4th 761 (1997) and *Birkenfeld v. Berkeley*, (1976) 717 Cal. 3d 129.

75.    The City staff made specific recommendations regarding the composition of a to-be-formed rental housing board after studying and reviewing similar boards throughout the state of California. The staff recommended that the composition of the board be composed of three members that are tenants, three members that are landlords and one member at large without either affiliation – i.e. a board that is balanced between the stakeholder's interests with a neutral party as a potential tie-breaking vote.

76.    Contrary to such recommendation, City Council inquired about the viability of an unbalanced board and the impact thereon, wherein staff expressed

concerns about potential due process challenges. [Judson Brown, City Housing Division Manager, explained that there was a lack of evidence in support of an imbalanced Board, in response to Councilmember Pham's questions. The evidence actually supported "balanced" boards due to "due process" concerns:

> "Based on our research of other jurisdictions, there aren't other jurisdictions with an imbalanced board…where there's either more tenant or more landlords. There is a reason for that. We found in our research that most boards are equitably balanced between tenants and landlords and that serves the best interest of tenants and landlords as they are following the due process rights under the law." Comments by Councilmember Pham and Judson Brown, City Housing Division Manager, City of Santa Ana City Council Meeting, October 4, 2022, 5:48:35 to 5:51. https://youtu.be/Cq6b2JtGLxI?t=20922, cited in correspondence from L. Sue Loftin to City, dated October 13, 2022, regarding Agenda Item 21.

77.   City Attorney specifically reiterated the necessity of a "fair hearing before a neutral and fair board" and that the "[the City Council] would be best served by having a balanced board from the get-go" and that interested parties could raise due process concerns. Comments by City Attorney Sonia Carvalho, City of Santa Ana City Council Meeting October 4, 2022, 5:56:30, available at: https://www.youtube.com/watch?v=Cq6b2JtGLxI&t=21400s, cited in correspondence from L. Sue Loftin to City of San Clemente, October 13, 2022 regarding Agenda Item 21.

78.   Despite the staff and city attorney recommendations and comments, the City enacted the New Ordinance with an imbalanced board without regard to the proper process and largely based upon wild speculation, without evidence in the record in a direct violation of the Plaintiffs' due process rights.

79.    The City Council adopted a rent housing board to be comprised of three (3) tenants, including at least one being a mobilehome park tenant; two (2) landlords; and two (2) at large members with no financial interest.

80.    This combination of (1) mandated mobilehome park tenant and tenant members, (2) the lack of any mobilehome park landlord members, and fewer landlords, (3) the nature of adversaries in all mobilehome park rental adjustment cases (mobilehome park landlords versus mobilehome park tenants), and the nature of controversy in all cases (dispute concerning fair return on property created by tenants' rights to pay reduced rent) deprives a mobilehome park owner of procedural due process, because the City does not furnish an impartial tribunal, in the same fashion as *American Motors Sales Corp. v. New Motor Vehicle Bd.*, (1977) 69 Cal. App. 3d 983, 992.

81.    A fair trial in a fair tribunal is a basic requirement of due process. *In re Murchison* 349 U.S. 133 (1955)("Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness.").

82.    "Due process requires a competent and impartial tribunal in the administrative hearings. (*Goldberg v. Kelly* 397 U.S. 254, 271 (1970)).  Even if there is no showing of actual bias in the tribunal, due process is deemed to be denied by circumstances that create the likelihood or appearance of bias. (*Peters v. Kiff*, 407 U.S. 493, 502 (1972)]" *Nissan Motor Corp. v. New Motor Vehicle Bd.* (1984) 153 Cal. App. 3d 109, 113.

83.    The composition of the board creates a bias towards residents and expressly allows for a resident within a mobilehome park voice, but no equal voice of landlords who are responsible for the ownership, operation, maintenance, repairs, and overall upkeep of the properties resided in by the tenants and does not provide for an express voice of a mobilehome park owner – a "lack of any counterbalance."
///

84.     The City of Santa Ana has thirty mobilehome parks consisting of 3,977 spaces. The unique operations and ownership issues relating to mobilehome parks are not represented by the unequal board composition; however, these tenants have a voice on this board. If the composition was reversed, with certainty for mobilehome park landlords, and no certainty for mobilehome park tenants, those tenants would find this arrangement in rent adjudication unacceptable.

85.     The New Ordinance also restricts the transfer of real property—mobilehome parks—without a City hearing and a report on the impact of the transfer on mobilehome tenants.

86.     This requirement of a hearing and report would delay the sale of such real property for a period adequate to prepare and submit the report, and provide a noticed public hearing, together with any rights of appeal. Based on the notice provisions, there is likely a minimum thirty-to-sixty-day period delaying any sale of a mobilehome park, together with the regulatory costs imposed.

87.     This hearing, report, notice, and delay are directly contrary and preempted by the MRL, Sec. 798.80, which only provides for notices of a sale to be provided to a recognized resident organization that has provided notice, and expressed an interest in purchasing the park, and which separately provides exemptions for transfers within entities, joint tenants, within partnerships, and between natural relations or by gift, devise, or operation of law.

88.     The closure of a mobilehome park or conversion of a mobilehome park to another use, are separately restricted by California Government Code Sec. 65863.7, which requires a report on the potential closure and the preparation of a tenant impact report that ameliorates the impact of any change on residents. This is because such a closure or conversion to another use are the only cognizable methods by which a tenant would be impacted.

89.     A mere sale cannot affect residents—as a sale does not affect the entitlements and law that apply to a mobilehome park. Put differently, a

mobilehome park cannot close, or change its use, by virtue of a sale. It can only close or change its use through lawful process.

90.     Accordingly, the City's requirement of a hearing, notice, and delay lacks any rational relationship to a legitimate state interest—in addition to being preempted by state law. Such a report would only contain the contents that the park is sold, and that as a result of the law affecting mobilehome parks, such sale cannot affect its residents.

91.     Plaintiffs acknowledge that under rational basis review, courts generally uphold governmental decisions that are rationally related to a state interest. Because Plaintiffs do not allege that the City's requirement of a hearing, notice, and delay 'implicates a "fundamental right" or utilizes a suspect classification, the provision need only meet "meet the (unexacting) standard of rationally advancing some legitimate governmental purpose." *See Richardson v.* City & County of Honolulu, 124 F.3d 1150, 1162 (9th Cir. 1997); *see also Reno v. Flores*, 507 U.S. 292, 302, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993). A regulation fails this test if it is arbitrary and irrational. *See Richardson*, 124 F.3d at 1162. Plaintiffs bear the "extremely high" burden of establishing that the provision fails to rationally advance a legitimate government interest. *See Richardson*, 124 F.3d at 1162.' *Better Hous. for Long Beach v. Newsom*, 452 F. Supp. 3d 921, 936-37 (C.D. Cal. 2020).

92.     However, Plaintiffs believe that this Court will see that this regulation, in both its preemption by state mobilehome law, and the impact of its delay without rational relationship to any interest not already protected by Cal. Gov. Code Sec. 65863.7, leads to the unavoidable conclusion that the law is wholly disconnected from any legitimate government interest in the City.

93.     This City requirement then lacks any rational relationship to a legitimate state interest—it only serves to delay any potential sale, and to prevent the lawful increase of rents if it is overlooked in the event of any transfer or sale,

particularly given that it would be the first such restriction of alienation of property of its kind.

94.    Accordingly, the requirement unreasonably deprives mobilehome park owners of the right to alienate property without unreasonable restriction, contrary to the due process clause of the Fourteenth Amendment of the United States Constitution, and 42 U.S.C. Sec. 1983.

<u>THIRD CAUSE OF ACTION</u>

**The Original Ordinance Is An Uncompensated Taking in Violation of the Fifth Amendment to the United States Constitution – 42 U.S.C. § 1983**

(*By Plaintiffs against All Defendants*)

95.    Plaintiffs refer to, repeat, and incorporate herein by reference as though fully set forth at length the allegations contained in paragraphs 1 through 96.

96.    The Original Ordinances, upon adoption thereof, constitute a regulatory or other taking without just compensation as the Fifth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, provides that private property cannot be taken for "public use, without just compensation."  These Original Ordinances effectuated a taking by virtue of (1) their economic impact and, particularly, the extent and severity the Original Ordinances interfered with the Plaintiffs' distinct investment-backed expectations and (2) as set forth in detail herein the nature and character of the City's action.  The factors, as applicable to this case, demonstrate that the City's enactment of these Original Ordinances caused a serious interference with the Plaintiffs' legitimate property interest in these mobilehome parks.

97.    Plaintiffs include entities acting for and on behalf of their investor-owners, who necessarily have legitimate investment-backed expectations that they can derive a fair market rental value from their rental mobilehome parks in the City of Santa Ana, California.  Plaintiffs developed and/or purchased their properties with the reasonable expectation they would be able to charge rent for spaces and

have legal recourse if tenants failed to pay rent when contractually due or increase rent based on economic conditions. If Plaintiffs are prevented from receiving fair market rent and pass-through for capital improvements, they would be compelled to stop improving their property and sell the property at a loss.

98.     Plaintiffs are informed and believe, and thereon allege, that the Original Ordinance, upon its adoption, interfered with the distinct investment-backed expectations of owners of mobilehome parks in the City.  In particular:

a.     The Original Ordinance effectively condemns a perpetual, below-market lease, transfers it to the initial tenant, and then permits that tenant to sell the lease to future owners with the transfer of their mobilehome—tantamount to key money—as the Original Ordinance arguably regulates the rents for the mobilehome space, and not just a tenancy.

b.     The Original Ordinance purports to allow an investor to obtain a reasonable rate of return by capping the maximum increase on the amount of rent regardless of the current market conditions such as increases in the consumer price index reflecting inflation, corresponding increases in adjustable-rate debt, increases in risk-free return from other assets, staffing and maintenance cost increases, and other impacts.

c.     The Original Ordinance places a maximum on the rental increase allowed even for utility charges passed through directly to the tenants of an owner, thereby requiring the owner to undergo the burden of the costly petition process to pass along increases in utility costs which the owner has no option but to then absorb—notwithstanding that the utility cost increases reflect California Public Utility Commission-approved rate schedules and tariffs.

d.     The Original Ordinance purports to allow an owner the right to petition the City for an increase above the maximum amount allowed for specific increases in costs; however, the petition process required the petitioner to pay all costs of the petition process including costs to obtain independent financial reports

and all costs incurred by the City.

e.     Further, the Original Ordinance does not include as a factor in this final determination that the City Manager may consider in deciding a fair rate of return petition, the cost of capital improvements to the common areas of the property.  Plaintiffs own and operate mobilehome parks which include substantial common area improvements including streets, clubhouses, pools, spas, laundry rooms, bathroom/shower facilities, electrical distribution systems and meters, water distribution lines and meters, sewer facilities and other electrical services which provide services to the individual spaces. By excluding these elements from the petition process, it is unclear if the City Manager will take into consideration the capital improvements required to be performed by an owner to simply keep the property functioning and providing a safe, livable environment for the residents.

99.     The New Ordinance requires an owner to provide a report to all tenants upon the sale of a mobilehome park at least 60 days prior to a sale which report shall include the impact on the sale of the park including a replacement and relocation plan that "adequately mitigates the impact upon the ability of any displaced residents of the Mobilehome Park to be sold to find adequate housing in a Mobilehome Park…" (New Ordinance ¶ 8-3120,(i)) even when the mobilehome park will continue to operate as a rental mobilehome park thereby not causing any replacement or relocation of a single tenant and will not result in the displacement of a single resident (the "Park Sale Report"). In fact, the MRL expressly provides and governs the exclusive grounds upon which a mobilehome park tenancy may be terminated and the sale of a mobilehome park to continue as a rental mobilehome park is not a valid ground for a termination or displacement of a mobilehome park tenant.

100.   This provision of the New Ordinance, coupled with the requirement that said Park Sale Report be provided to the City through the Rental Registry portal, creates an unreasonable restriction on alienation and an unconstitutional

exercise of the police power, in that it lacks any reasonable relationship to a legitimate government interest.

101.   The City's stated intent and goal of the Original Ordinance, which intent and goal are incorporated into the New Ordinance, is so that "renters would have an extra $176 million dollars of disposable income…to spend in the community each year…." Original Ordinance, Section 1, Paragraph E. The City's goal is to take rental income from property owners and transfer that to other businesses within the community.  There cannot be claimed to be an "average reciprocity of advantage" where the regulation solely confiscates future rent increases, and thwarts prior, distinct investment-backed expectations.

102.   As a separate, independent ground, Plaintiffs are further informed and believe and thereon allege, that any "fair return" application provision under the Original Ordinances was inadequate to compensate for the nature and value of the taking, and that fair return application would be futile, given (i) the discretion afforded the City Manager as delegate, agent, and employee of the City Council; (ii) the costly, prohibitive requirements of the myriad of applications and information required; (iii) the exclusion of factors to be considered by the City Manager in the review of the petition, (iv) the inherent delay in requiring rent control petitions prior to the City Manager adjusting maximum rent, and (v) the fact that the ordinance, on its face, does not require the action on a petition within any period of time. *Palazzolo v. Rhode Island*, 533 U.S. 606, 626 (2001)("federal ripeness rules do not require the submission of further and futile applications…").

103.   Further, the imbalanced board, and its denial of procedural due process prevents a landlord from obtaining rental adjustments assuring a fair return. See, e.g. *Kavanau v. Santa Monica Rent Control Board*, 16 Cal. 4th 761 (1997). (where the California Supreme Court adopts and expands the regulatory takings jurisprudence in *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978).). This imbalanced board also effectuates a facial taking by offering

an insufficient compensation regime.

104. The Original Ordinance actually imposes the entire burden and expense of the governmental purpose of preserving affordable housing on owners of mobilehome parks, without compensation, contrary to the Fifth Amendment.

105. Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to declaratory relief determining that the City's Original Ordinance and the New Ordinance, effected a taking of private property under the Takings Clause of the Fifth Amendment to the United States Constitution.

106. By the Takings Clause of the Fifth Amendment to the United States Constitution the Original Ordinance actually impose the entire burden and expense of the governmental purpose of preserving affordable housing upon owners of mobilehome parks, without compensation, contrary to the Fifth Amendment, and 42 U.S.C. § 1983.

107. The facts alleged herein demonstrate that the economic impact of the Ordinances is severe and harmful to the Plaintiffs, who are contractually entitled to receive rent from tenants on a monthly basis and cannot long survive if tenants are permitted to continue occupying the Parks without Plaintiffs being able to keep up with rising inflation and the cost of doing business for a sustained and indefinite period of time and the economic impact of the Ordinances is severe and harmful to Plaintiffs whose right to alienation of the real property is subject to new, additional, regulatory and financial requirements which substantially impact the ability to sell the property and substantially increases the cost of doing business.

108. Accordingly, the Original Ordinance does not serve to balance the "benefits and burdens of economic life to promote the common good," but rather effectuate a taking of the private property which, itself demands, just compensation. *Penn Central Trans. Co.,* 438 U.S. 104, 124 (1978). Consequently, City's actions constitute a taking and thereby violate the Takings Clause of the Fifth Amendment causing proximate and legal harm to the Plaintiffs.

109.   Plaintiffs are informed and believe and thereon allege, that the City's actions as set forth above, constitute state action in violation of 42 U.S.C. § 1983 and thus Plaintiffs are entitled to just compensation.

110.   As a direct and proximate result of the above-described actions by Defendant, Plaintiffs have been, and will continue to be, damaged in an amount yet to be ascertained, but to be established at trial.

111.   Plaintiffs have incurred, and will incur attorney's fees, expert witness fees, and other fees and costs, as a result of this proceeding, in amounts that cannot yet be ascertained but which are recoverable pursuant to the provisions of 42 U.S.C. §§ 1983 and 1988 but will and do exceed $75,000.00.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff's prayer for judgment is as follows:

**1.**  A declaration by this Court that the New Ordinance:

    a.  in so far as it conflicts with existing California state law, is impermissibly vague and ambiguous, and is unconstitutional.

    b.  insofar as it implicates an imbalanced board, constitutes a violation of the procedural due process rights of the Plaintiffs, and is unconstitutional.

    c.  insofar as it requires a report to the residents, hearing prior to and on account of the mere occasion of a sale of property, constitutes a violation of the substantive due process rights of the Plaintiffs, and is unconstitutional.

    d.  does not regulate the changes in rent upon the turn over of a tenancy in a mobilehome park.

    e.  is impermissibly vague by including conflicting, vague and ambiguous language.

**2.**  A determination that Defendants' Original Ordinance, New Ordinance and related actions effected an uncompensated taking of private property,

entitling Plaintiffs' to an award of "just compensation" in the amount that exceeds $75,000.00.

3. Award Plaintiffs damages arising out of their Section 1983 and constitutional claims, and specifically "just compensation" under the Fifth and Fourteenth Amendments to the United States Constitution.

4. Award Plaintiffs their costs and reasonable attorney's fees and litigation expenses incurred in this action pursuant to 42 U.S.C. § 1988 and Cal. Code Civ. Proc. § 1036 that exceed $75,000.00;

5. For preliminary and permanent injunctive relief, according to proof.

6. For an award of reasonable attorney fees pursuant to 42 U.S.C. § 1988 and all other applicable statutes.

7. For costs incurred in this suit.

8. For such other relief as the Court may deem just and proper.

Dated: January 17, 2023                    **WASSON & ASSOCIATES, INC.**

By: _____
**DAVID B. WASSON, ESQ.**
Attorney for Plaintiffs, KINGSLEY
MANAGEMENT CORP., a Utah
corporation, KMC CA Management,
LLC, a Utah limited liability company;
COUNTRY CLUB LAND - 098, L.P.,
a Utah limited partnership.

Dated: January 17, 2023                    **LOFTIN|BEDELL P.C.**

By: _____
**L. SUE LOFTIN, ESQ, ESQ.**
Attorney for Plaintiffs, KINGSLEY
MANAGEMENT CORP., a Utah
corporation, KMC CA Management,
LLC, a Utah limited liability company;
COUNTRY CLUB LAND - 098, L.P.,
a Utah limited partnership.

Exhibit "A"

ORDINANCE NO. NS-3027

AN ORDINANCE OF THE CITY COUNCIL OF THE CITY
OF SANTA ANA AMENDING ARTICLE X OF CHAPTER 8
OF THE SANTA ANA MUNICIPAL CODE AND CREATING
A NEW ARTICLE XIX IN CHAPTER 8 OF THE SANTA ANA
MUNICIPAL CODE PERTAINING TO THE RENT
STABILIZATION AND JUST CAUSE EVICTION
ORDINANCES

THE CITY COUNCIL OF THE CITY OF SANTA ANA DOES ORDAIN AS
FOLLOWS:

Section 1.    The City Council of Santa Ana hereby finds, determines, and
declares as follows:

A. At the City Council meetings on September 21, 2021, and October 5, 2021,
   the City Council discussed the City of Santa Ana's ("Santa Ana" or "City")
   ability to address rent increases on residential real property and in
   mobilehome parks.

B. On October 19, 2021, the City Council adopted Ordinance No. NS- 3009,
   known as the Rent Stabilization Ordinance ("RSO") and Ordinance No. NS-
   3010, known as the Just Cause Eviction Ordinance ("JCEO") appearing as
   Article X, Division 4 and Division 5 in the Santa Ana Municipal Code
   ("SAMC"). The RSO and JCEO were adopted to regulate rent increases and
   evictions in certain rental properties and mobilehome spaces in the City of
   Santa Ana.

C. The findings in Ordinance No. NS- 3009 and Ordinance No. NS-3010
   articulate that significant rent increases and housing instability pose a threat
   to public health, safety and welfare, and a particular hardship for senior
   citizens, persons living on fixed incomes, and other vulnerable persons living
   in Santa Ana. These findings are still true and incorporated herein.

D. Additionally, the City Council adopted Resolution No. 2021- 054, directing
   staff to: (1) Conduct further study of the additional regulatory framework and
   infrastructure necessary to implement residential rent stabilization, just cause
   eviction, and other protections for Santa Ana residents facing housing
   instability; and, (2) Include the creation and operation of a Rent Board or
   similar body, a rent registry, and the related costs thereof.

E. On September 6, 2022, staff presented the Long-Term Implementation Plan
   for the RSO and JCEO to the City Council detailing various best practices
   based on findings from local sample jurisdictions with similar ordinances in
   the State of California.

F. On September 6, 2022, the City Council adopted the Long-Term Implementation Plan for the RSO and JCEO and provided direction to staff to prepare amendments to the RSO and JCEO to implement efficient and effective program services to rental property owners and tenants and promote long-term sustainability of the programs.

G. The amendments proposed by this Ordinance are consistent with the adopted Long-Term Implementation Plan of the RSO and JCEO and the direction by City Council at the September 6, 2022 City Council meeting. These include:

1. Create a Rental Housing Board;
2. Create a Rental Registry;
3. Adopt a Rental Registry Fee;
4. Develop a Work Plan;
5. Conduct a Fee Study Based on the Work Plan and Staffing Needs;
6. Expand Compliance Activities;
7. Create a Capital Improvement Petition and Tenant Petition;
8. Establish Petition Fees and a Petition Review Process;
9. Create a Voluntary Mediation Process; and,
10. Join the Rent Stabilization Consortium.

H. Pursuant to the City's police power, as granted broadly under Article XI, section 7 of the California Constitution, and Santa Ana Charter section 200, the Santa Ana City Council has the authority to enact and enforce ordinances and regulations for the public peace, health, and welfare of the City and its residents.

I. The City Council finds, determines and declares that the threat to the public health, safety and welfare of the City and its residents necessitates the enactment of the Ordinance.

J. The Request for City Council Action for amendments to these Ordinances dated October 4, 2022, shall, by this reference, be incorporated herein, and together with this Ordinance, any amendments or supplements, and oral testimony, constitute the necessary findings for this Ordinance.

Section 2.    The recitals and statements of fact set forth in the preamble to this Ordinance are true and correct, constitute a substantive part of this Ordinance, and are incorporated herein by this reference.

Section 3.    Divisions 4 and 5 of Article X (Property Maintenance) of Chapter 8 (Buildings and Structures) of the Santa Ana Municipal Code are hereby amended and moved to a new Article XIX (Rent and Evictions) of Chapter 8 of the Santa Ana Municipal Code to read as follows:

Ordinance No. NS-3027
Page 2 of 43

ARTICLE XIX. – RENT STABILIZATION AND JUST CAUSE EVICTION ORDINANCE

DIVISION 1. – GENERALLY

Section 8-3100 – Title

This Article shall be known in its entirety as the "City of Santa Ana Rent Stabilization and Just Cause Eviction Ordinance" and, for the sake of convenience, as the "Rent Stabilization and Just Cause Eviction Ordinance."

Section 8-3101 – Background

The Rent Stabilization Ordinance, previously adopted by the City Council on October 19, 2021, and the Just Cause Eviction Ordinance, also previously adopted by the City Council on October 19, 2021, are hereby amended pursuant to this newly adopted Rent Stabilization and Just Cause Eviction Ordinance.

Section 8-3102 – Definitions

a)      For purposes of this Article, the words and phrases shall be defined as set forth herein, unless the context clearly indicates a different meaning is intended.

b)      Words and phrases used in this Article, which are not specifically defined, shall be construed according to their context and the customary usage of the language.

c)      Words and phrases defined:

"Annual Allowable Rent Adjustment" means the limit on the Maximum Allowable Rent Increase, which a Landlord may charge on any Rental Unit each year.

"Capital Improvement" means an improvement, addition or major repair to a Rental Unit that were paid for and completed after November 19, 2021 (the effective date of the first adopted Rent Stabilization Ordinance), provided such new improvement, addition or major repair has a useful life of five (5) years or more and that is required to be amortized over the useful life of the improvement, such as: structural, electrical, plumbing, or mechanism system, roofing, carpeting, draperies, stuccoing the outside of a building, air conditioning, security gates, swimming pool, sauna or hot tub, fencing, children's play equipment permanently installed, the complete exterior painting of a building, and other similar improvements as defined under the straight line depreciation provisions of the Internal Revenue Code and the regulations issued pursuant thereto and determined by the Rental Housing Board. Capital Improvement does not

include normal or routine maintenance, repair, replacements, and/or deterioration resulting from an unreasonable delay in the undertaking of completion or after a Notice of Violation by a government agency ordering repairs.

"City" means the City of Santa Ana.

"Hearing Officer" means a person who has been appointed by the Program Administrator to perform the duties set forth in this Article.

"Housing Services" means those services provided and associated with the use or occupancy of a Rental Unit including, but not limited to, insurance, repairs, replacement, maintenance, effective waterproofing and weather protection, painting, providing light, heat, hot and cold water, elevator service, window shades and screens, laundry facilities and privileges, janitorial services, utilities that are paid by the Landlord, refuse removal, allowing pets, telephone, parking, storage, the right to have a specified number of Tenants or occupants, computer technologies, entertainment technologies, including cable or satellite television services, and any other benefits, privileges or facilities connected with the use or occupancy of such Rental Unit including a proportionate share of the services provided to common facilities of the building in which such Rental Unit is located and/or of the property on which such Rental Unit is located.

"Landlord" or "Owner" means an owner of record, lessor, sublessor or any person, partnership, corporation, family trust, or any other business entity, or any successor in interest thereto, offering for rent or lease any Rental Unit or Mobilehome or Mobilehome Space in a Mobilehome Park in the City and shall include the employee, agent or representative of the Landlord if the agent or representative has the full authority to answer for the Landlord and enter into binding agreements on behalf of the Landlord.

"Mediator" means a person whom the Program Administrator determines meets all of the following criteria:
1) Has received forty (40) to eighty (80) hours of formal training in mediation, including training in anti-racism, elimination of bias, diversity, equity, inclusion, and cultural competency; and,
2) Has mediated Rent disputes and/or has had other experience or training showing a capability to mediate the issues which arise in landlord/tenant disputes.

"Mobilehome" means a structure designed for human habitation and for being moved on a street or highway under permit pursuant to Section 35790 of the Vehicle Code. Mobilehome includes a manufactured home, as defined in Section 18007 of the Health and Safety Code, and a Mobilehome, as defined in Section 18008 of the Health and Safety Code,

but does not include a recreational vehicle, as defined in Section 799.29 of this code and Section 18010 of the Health and Safety Code or a commercial coach as defined in Section 18001.8 of the Health and Safety Code.

"Mobilehome Space" means the rental of a spot for a Mobilehome within a Mobilehome Park by a homeowner, as defined in Civil Code section 798.9, or a resident, as defined in Civil Code section 798.11.

"Mobilehome Park" means an area of land where two or more Mobilehome Spaces are rented, or held out for rent, to accommodate Mobilehomes used for human habitation.

"Net Operating Income" means the net revenue received by the Landlord after paying the normal Operating Expenses (gross revenue less normal operating expenses).

"Operating Expenses" means the costs of normal operations, including, but not limited to, management, taxes, insurance, maintenance, repairs and other recurring costs.

"Program Administrator" is a person designated by the City Manager to administer the provisions of this Article.

"Rental Registry Fee" or "Fee" means the fee the City imposes on each Rental Unit to cover the costs to administer the provisions of this Article.

"Rent" means all periodic compensation, including all non-monetary consideration, that a Tenant provides to a Landlord concerning the use or occupancy of a Rental Unit, including any amount included in the Rent for utilities (unless separately billed to the Tenant by the utility company), parking, storage, pets or for any other fee or charge associated with the Tenancy for the use or occupancy of a Rental Unit and related Housing Services. Rent includes, without limitation, the fair market value of goods accepted, labor performed, or services rendered. With respect to Mobilehomes and Mobilehome Spaces in Mobilehome Parks, any regulations of rent, fees, and costs included within the Mobilehome Residency Law, Civil Code section 798, et seq., shall be incorporated into the definition of Rent, as applicable.

"Rent Increase" means any additional Rent demanded of or paid by a Tenant for a Rental Unit, including any reduction in Housing Services without a corresponding reduction in the amount demanded or paid for Rent; or a pro rata increase in costs of Housing Services apportioned to a Rental Unit.

"Rental Agreement" means a lease, sublease, or other agreement, written, oral or implied, between a Landlord and a Tenant for the use and/or occupancy of a Rental Unit and for Housing Services.  With respect to Mobilehomes and Mobilehome Spaces in Mobilehome Parks, any regulations of rental agreements or leases within the Mobilehome Residency Law, Civil Code section 798, et  seq., shall be incorporated into the definition of Rental Agreement, as applicable.

"Rental Housing Board" or "Board" means the Rental Housing Board established by Division 5 of this Article XIX of Chapter 8 of the Santa Ana Municipal Code.

"Rental Registry" means the database or portal where Landlords register Rental Units, update Rental Unit information, update Tenancy information, submit notices, and pay the Rental Registry Fee.

"Rental Unit" means any building, structure, or part thereof, or any Mobilehome and Mobilehome Spaces in a Mobilehome Park, offered or available for rent for residential use or occupancy in the City, including the land appurtenant thereto, together with all Housing Services in connection with the use or occupancy thereof, including common areas and recreational facilities held out for use by the Tenant, which is not exempt pursuant to the exemptions set forth in this Article.

"Residential Real Property" or "Residential Property" means any housing unit, including a room or group of rooms designed and intended for occupancy by one or more persons, including a Rental Unit and a Mobilehome or Mobilehome Space in a Mobilehome Park, offered for rent or lease in the City.

"Tenancy" means the right or entitlement of a Tenant to use or occupy a Rental Unit, including a Mobilehome or Mobilehome Space in a Mobilehome Park.

"Tenant" means any renter, tenant, subtenant, lessee, sub-lessee, roommate with Landlord's consent, or any other person or entity entitled under the terms of a Rental Agreement, or by sufferance, or by state or federal law, to the use or occupancy of any Rental Unit and (i) has the legal responsibility for the payment of Rent for a Rental Unit or (ii) has agreed to pay the Rent for a Rental Unit.

Section 8-3103 – Implementing Regulations, Policies and Procedures

The City Manager or Program Administrator shall have the authority to promulgate regulations, policies and procedures to implement the requirements and

Ordinance No. NS-3027
Page 6 of 43

fulfill the purposes of this Article.  No person shall fail to comply with such regulations, policies and procedures.

Section 8-3104 – Mobilehome Residency Law

The provisions of this Article shall not supersede the regulations of the state Mobilehome Residency Law, Civil Code section 798, et seq., as applicable.  If there is any conflict between the terms of this Article and the Mobilehome Residency Law, the Mobilehome Residency Law shall prevail.

DIVISION 2. – JUST CAUSE EVICTIONS

Section 8-3120 – Restrictions on Termination of Tenancy without Just Cause

(a)  After a Tenant has continuously and lawfully occupied a Residential Real Property for thirty (30) days, the Owner of the Residential Real Property shall not terminate the Tenancy without just cause, which shall be stated in the written notice to terminate Tenancy.  The provisions of this section related to the termination of Tenants shall not apply to Mobilehomes or Mobilehome Spaces in Mobilehome Parks subject to the termination provisions of the Mobilehome Residency Law, Civil Code section 798.56, as applicable.

1) The Owner shall post a notice on a form prescribed by the City, providing information about the existence of this Division 2 of Article XIX of Chapter 8 of the Santa Ana Municipal Code, including protections related to immigration or citizenship status of Tenant found under Civil Code section 1940.35 and Code of Civil Procedure section 1161.4, as may be amended. Notice must be posted in a conspicuous location on the property. The notice shall be written in the language that the Owner and Tenant used to negotiate the terms of the Tenancy (e.g., Spanish, Chinese, Tagalog, Vietnamese and Korean), as well as English.

2) In addition to all other notice requirements specified elsewhere in this Division, the Owner of any Residential Real Property or Mobilehome Space, is required to provide written notice to Tenants of their rights under this Division as follows:

A. The notice required by this Division must be on a form prescribed by the City and include the following information:

i. The existence and scope of this Division 2 of Article XIX of Chapter 8 of the Santa Ana Municipal Code; and,

        ii.   The right to relocation assistance in limited circumstances pursuant to subsection (d)(2) herein.

   B. The Owner must provide Tenant with the notice upon serving any notice of change in terms of Tenancy.

   C. The Owner must provide the notice on or before the commencement of all Tenancies initiated after the effective date of this Division.

(b)   For purposes of this section, "just cause" includes either of the following:

   1) At-fault just cause, which is any of the following:

      A. Default in the payment of Rent.

      B. A breach of a material term of the lease, as described in paragraph (3) of Section 1161 of the Code of Civil Procedure, including, but not limited to, violation of a provision of the lease after being issued a written notice to correct the violation. A "breach of a material term" shall not include:

         i.   The obligation to limit occupancy, provided that the additional occupant who joins the Tenant of the Residential Real Property thereby exceeding the limits on occupancy set forth in the lease is:

            I.   A dependent under age 18, or

            II.   A replacement Tenant who moved in after an approved Tenant vacated the Residential Real Property, so long as the addition does not exceed the Uniform Housing Code.

               i.   The Owner shall have the right to approve or deny the prospective additional or replacement Tenant, who is not a minor dependent child, provided that the Owner does not unreasonably withhold approval. If the Owner fails to respond to the Tenant in writing with a description of the reasons for the denial of the request within a reasonable amount of time of receipt of the Tenant's written request, the Tenant's request shall be deemed approved by the

Owner if the lease is for a period of one (1) year or less.

    ii.    A change in the terms of the Tenancy that is not the result of an express written agreement signed by both of the parties. An Owner is not required to obtain a Tenant's written consent to a change in the terms of the Tenancy if the change in the terms of the Tenancy is authorized by this section, or if the Owner is required to change the terms of the Tenancy pursuant to federal, State, or local law. Nothing in this subsection shall exempt an Owner from providing legally required notice of a change in the terms of the Tenancy.

C.    Maintaining, committing, or permitting the maintenance or commission of a nuisance as described in paragraph (4) of Section 1161 of the Code of Civil Procedure.

D.    Committing waste as described in paragraph (4) of Section 1161 of the Code of Civil Procedure.

E.    The Tenant had a written lease that terminated on or after the effective date of this Ordinance, and after a written request or demand from the Owner, the Tenant has refused to execute a written extension or renewal of the lease for an additional term of similar duration with similar provisions, provided that those terms do not violate this section or any other provision of law.

F.    Criminal activity by the Tenant on the Residential Real Property, including any common areas, or any criminal activity or criminal threat, as defined in subdivision (a) of Section 422 of the Penal Code, on or off the Residential Real Property, that is directed at any Owner or agent of the Owner of the Residential Real Property or members of Tenant's household or other Tenants of the Residential Real Property. This at-fault, just cause provision shall apply if the Owner has, within a reasonable time, reported the criminal activity to law enforcement. Further, at-fault, just cause eviction of a Tenant under this provision shall only apply to that Tenant who committed the criminal activity described herein. If a Tenant is acquitted or found not guilty of the charges giving rise to eviction, or if charges are not filed against the Tenant within the applicable statute of limitations period, the Tenant shall be offered the right to restore the Tenancy only if the same Residential Real Property is available.

G. Assigning or subletting the premises in violation of the Tenant's lease, as described in paragraph (4) of Section 1161 of the Code of Civil Procedure.

    i.  Notwithstanding any contrary provision in this section, an Owner shall not take any action to terminate a Tenancy based on a Tenant's sublease of the Residential Real Property if all the following requirements are met:

        I.  The Tenant requests permission from the Owner in writing to sublease the Residential Real Property;

        II.  The Tenant continues to reside in the Residential Real Property as their primary residence;

        III.  The sublease replaces one or more departed Tenants under the lease on a one-for-one basis; and

        IV.  The Owner fails to respond to the Tenant in writing within a reasonable amount of time of the receipt of the Tenant's written request. If the Owner fails to respond to the Tenant's written request, the request shall be deemed approved by the Owner if the lease is for a period of one (1) year or less. An Owner's reasonable refusal of the Tenant's written request may be based on, but is not limited to, the ground that the total number of occupants in a Residential Real Property exceeds the maximum number of occupants as determined under Section 503(b) of the Uniform Housing Code or successor provision.

H. The Tenant's refusal to allow the Owner to enter the Residential Real Property as authorized by Sections 1101.5 and 1954 of the Civil Code, and Sections 13113.7 and 17926.1 of the Health and Safety Code.

I. Using the premises for an unlawful purpose as described in paragraph (4) of Section 1161 of the Code of Civil Procedure.

J. The employee, agent, or licensee's failure to vacate after their termination as an employee, agent, or a licensee as described in paragraph (1) of Section 1161 of the Code of Civil Procedure.

K.  When the Tenant fails to deliver possession of the Residential Real Property after providing the Owner written notice as provided in Section 1946 of the Civil Code of the Tenant's intention to terminate the hiring of the real property, or makes a written offer to surrender that is accepted in writing by the Owner but fails to deliver possession at the time specified in that written notice as described in paragraph (5) of Section 1161 of the Code of Civil Procedure.

2)  No-fault just cause, which includes any of the following:

A.

    i.  Intent to occupy the Residential Real Property by the Owner or their spouse, domestic partner, children, grandchildren, parents, or grandparents.

    ii.  For leases entered into on or after the effective date of this Ordinance, this subsection shall apply only if the Tenant agrees, in writing, to the termination, or if a provision of the lease allows the Owner to terminate the lease if the Owner, or their spouse, domestic partner, children, grandchildren, parents, or grandparents unilaterally decides to occupy the Residential Real Property for a period of at least 24 months, as affirmed by the Owner in a written affidavit submitted to the City. Addition of a provision allowing the Owner to terminate the lease as described in this clause to a new or renewed Rental Agreement or fixed-term lease constitutes a similar provision for the purposes of subparagraph (E) of paragraph (1).

B.  Withdrawal of the Residential Real Property from the rental market for an anticipated period of at least 24 months, as affirmed by the Owner in a written affidavit submitted to the City.

C.

    i.  The Owner complying with any of the following:

        I.  An order issued by a government agency or court relating to habitability that necessitates vacating the Residential Real Property.

        II.  An order issued by a government agency or court to vacate the Residential Real Property.

III.    A local ordinance that necessitates vacating the Residential Real Property.

ii.    If it is determined by any government agency or court that the Tenant is at fault for the condition or conditions triggering the order or need to vacate under clause (i), the Tenant shall not be entitled to relocation assistance as outlined in paragraph (3) of subdivision (d).

D.

i.    Intent to demolish or to substantially remodel the Residential Real Property.

ii.

I.    The Owner shall provide advance notice to the Tenant of the ability to reoccupy the unit upon completion of the repairs, or if requested by the Tenant, the right of first refusal to any comparable vacant Rental Unit which has been offered at comparable Rent owned by the Owner; and

II.    In the event the Owner seeks to rent the remodeled unit within six (6) months following the completion of the remodeling work, the evicted Tenant shall have the right of first refusal to reoccupy and rent the unit, unless the Owner provides a written waiver by the Tenant of their right to reoccupy the premises pursuant to this subsection.

iii.    For purposes of this subparagraph, "substantially remodel" means the replacement or substantial modification of any structural, electrical, plumbing, or mechanical system that requires a permit from a governmental agency, or the abatement of hazardous materials, including lead-based paint, mold, or asbestos, in accordance with applicable federal, State, and local laws, that cannot be reasonably accomplished in a safe manner with the Tenant in place and that requires the Tenant to vacate the Residential Real Property for at least 30 days. Cosmetic improvements alone, including painting, decorating, and minor repairs, or other work that can be performed safely without having the Residential Real Property vacated, do not qualify as a substantial remodel.

(c)     Before an Owner of Residential Real Property issues a notice to terminate a Tenancy for just cause that is a curable lease violation, the Owner shall first give notice of the violation to the Tenant with an opportunity to cure the violation pursuant to paragraph (3) of Section 1161 of the Code of Civil Procedure. If the violation is not cured within the time period set forth in the notice, a three-day notice to quit without an opportunity to cure may thereafter be served to terminate the Tenancy.

     1)  Any written notice to cease or correct must:

          A.  Be dated and served upon the Tenant, pursuant to at least one of the methods authorized under California Code of Civil Procedure Section 1162, as may be amended;

          B.  Inform the Tenant that failure to cure may result in the initiation of eviction proceedings;

          C.  Inform the Tenant of the right to request a reasonable accommodation;

          D.  Inform the Tenant of the contact number for the Program Administrator; and

          E.  Include a specific statement of the reasons for the written notice to cease or correct with specific facts to help the Tenant determine the date(s), place(s), witness(es), and circumstance(s) that support the reason(s) for the eviction.

(d)

     1)  For a Tenancy for which just cause is required to terminate the Tenancy under subdivision (a), if an Owner of Residential Real Property issues a termination notice based on a no-fault just cause described in paragraph (2) of subdivision (b), the Owner shall, regardless of the Tenant's income, at the Owner's option, do one of the following:

          A.  Assist the Tenant to relocate by providing a direct payment to the Tenant as described in paragraph 3; or

          B.  Waive in writing the payment of Rent for the final three (3) months of the Tenancy, prior to the Rent becoming due.

     2)  If an Owner issues a notice to terminate a Tenancy for no-fault just cause, the Owner shall notify the Tenant of the Tenant's right to relocation assistance or Rent waiver and all other rights pursuant to this section. If the Owner elects to waive the Rent for the final three (3)

month of the Tenancy as provided in subparagraph (B) of paragraph (1), the notice shall state the amount of Rent waived and that no Rent is due for the final three (3) months of the Tenancy.

3)

 A. The amount of relocation assistance or Rent waiver shall be equal to three (3) months of the Tenant's Rent that was in effect when the Owner issued the notice to terminate the Tenancy. Any relocation assistance shall be provided within 15 calendar days of service of the notice.

 B. If a Tenant fails to vacate after the expiration of the notice to terminate the Tenancy, the actual amount of any relocation assistance or Rent waiver provided pursuant to this subdivision shall be recoverable as damages in an action to recover possession.

 C. The relocation assistance or Rent waiver required by this section shall be credited against any other relocation assistance required by any other law.

4) An Owner's failure to strictly comply with this section shall render the notice of termination void.

(e) This section shall not apply to the following types of residential real properties or residential circumstances:

1) Transient and tourist hotel occupancy as defined in subdivision (b) of Section 1940 of the Civil Code.

2) Housing accommodations in a nonprofit hospital, religious facility, extended care facility, licensed residential care facility for the elderly, as defined in Section 1569.2 of the Health and Safety Code, or an adult residential facility, as defined in Chapter 6 of Division 6 of Title 22 of the Manual of Policies and Procedures published by the State Department of Social Services.

3) Dormitories owned and operated by an institution of higher education or a kindergarten and grades 1 to 12, inclusive, school.

4) Housing accommodations in which the Tenant shares bathroom or kitchen facilities with the Owner who maintains their principal residence at the Residential Real Property.

5) Single-family Owner-occupied residences, including a residence in which the Owner-occupant rents or leases no more than two units or

Ordinance No. NS-3027
Page 14 of 43

bedrooms, including, but not limited to, an accessory dwelling unit or a junior accessory dwelling unit.

6) A duplex in which the Owner occupied one of the units as the Owner's principal place of residence at the beginning of the Tenancy, so long as the Owner continues in occupancy.

7) Housing that has been issued a certificate of occupancy within the previous 15 years.

8) Residential Real Property that is alienable separate from the title to any other dwelling unit, provided that both of the following apply:

  A. The Owner is not any of the following:

      i.  A real estate investment trust, as defined in Section 856 of the Internal Revenue Code.

      ii.  A corporation.

      iii.  A limited liability company in which at least one member is a corporation.

  B.

      i.  The Tenants have been provided written notice that the Residential Property is exempt from this section using the following statement: "This property is not subject to the just cause requirements of Santa Ana Municipal Code Chapter 8, Article XIX, Division 2. This property meets the requirements of Santa Ana Municipal Code section 8-3120(e)(8) and the Owner is not any of the following: (1) a real estate investment trust, as defined by Section 856 of the Internal Revenue Code; (2) a corporation; or (3) a limited liability company in which at least one member is a corporation."

      ii.  For a Tenancy existing before the effective date of this Ordinance, the notice required under clause (i) may, but is not required to, be provided in the Rental Agreement.

      iii.  For any Tenancy commenced or renewed on or after the effective date of this Ordinance, the notice required under clause (i) must be provided in the Rental Agreement.

      iv.  Addition of a provision containing the notice required under clause (i) to any new or renewed Rental

Agreement or fixed-term lease constitutes a similar provision for the purposes of subparagraph (E) of paragraph (1) of subdivision (b).

9) Housing restricted by deed, regulatory restriction contained in an agreement with a government agency, or other recorded document as affordable housing for persons and families of very low, low, or moderate income, as defined in Section 50093 of the Health and Safety Code, or subject to an agreement that provides housing subsidies for affordable housing for persons and families of very low, low, or moderate income, as defined in Section 50093 of the Health and Safety Code or comparable federal statutes.

(f) An Owner of Residential Real Property subject to this section shall provide notice to the Tenant as follows:

1) For any Tenancy commenced or renewed on or after the effective date of this Ordinance, as an addendum to the lease or Rental Agreement, or as a written notice signed by the Tenant, with a copy provided to the Tenant.

2) For a Tenancy existing prior to the effective date of this Ordinance, by written notice to the Tenant no later than thirty (30) days after the effective date of this Ordinance, or as an addendum to the lease or Rental Agreement.

3) The notification or lease provision shall be in no less than 12-point type, and shall include the following: "The Santa Ana Municipal Code provides that after all of the Tenants have continuously and lawfully occupied the property for at least thirty (30) days, an Owner must provide a statement of cause in any notice to terminate a Tenancy. See Division 2 of Article XIX of Chapter 8 of the Santa Ana Municipal Code for more information."

(g) It shall be a defense to an action for possession of a Rental Unit under this Division if a trier of fact determines that:

1) Both of the following provisions apply:

A. The Tenant or Tenant's household member is a victim of an act or acts that constitute domestic violence, elder or dependent adult abuse, sexual assault, human trafficking, or stalking if the domestic violence, elder or dependent adult abuse, sexual assault, human trafficking, or stalking has been documented by one of the following:

      i.    A temporary restraining order, emergency protective order, or protective order issued within the last 180 days pursuant to law that protects the Tenant or a household member from domestic violence, elder or dependent adult abuse, sexual assault, human trafficking, or stalking; or

      ii.    The Tenant or a member of their household has filed a police report within the previous 180 days alleging that they are a victim of domestic violence, elder or dependent adult abuse, sexual assault, human trafficking, or stalking.

    B.  The notice to vacate is substantially based upon the act or acts constituting domestic violence, elder or dependent adult abuse, sexual assault, human trafficking, or stalking against the Tenant or their household member, including, but not limited to, an action for possession based on complaints of noise, disturbances, or repeated presence of police.

  2)  Notwithstanding this Section, an Owner may terminate the Tenancy if:

    A.  The Tenant or the person protected by a court order or who filed a police report allows the person against whom the protective order has been issued or who was named in the police report as committing an act of domestic violence, elder or dependent adult abuse, sexual assault, human trafficking, or stalking, to visit the rental property; or

    B.  The Owner reasonably believes the presence of the person against whom the protective order has been issued or who was named in the police report as having committed an act of domestic violence, elder or dependent adult abuse, sexual assault, human trafficking, or stalking poses a physical threat to other Tenants, guests, invitees, or to a Tenant's right to quiet enjoyment and the Owner previously gave the Tenant a three (3) day written notice to cease and correct this violation.

  3)  The provisions of this Division shall not supersede any other applicable state laws relating to victims of an act of domestic violence, sexual assault, stalking, human trafficking, abuse of an elder or a dependent adult, or of other specified crimes, as provided for in Civil Code section 1946.7 and Code of Civil Procedure sections 1161.3 and 1174.27.

(h)    It shall be a defense to a no fault just cause action for possession of a Rental Unit under this Division if a person under the age of 21 is a resident

of the subject Rental Unit, or has a custodial or family relationship with a Tenant in the subject Rental Unit, and who is registered and actively attending any level of school during a specified school term.

(i)  At least sixty (60) days prior to the sale of a Mobilehome Park, the Owner shall provide notice of such proposed sale to the Mobilehome Park residents and prepare a report on the impact of the sale of the Mobilehome Park, including a replacement and relocation plan that adequately mitigates the impact upon the ability of any displaced residents of the Mobilehome Park to be sold to find adequate housing in a Mobilehome Park, as applicable.

(j)  Any waiver of the rights under this section shall be void as contrary to public policy.

Section 8-3121 – Notice of Termination of Tenancy.

(a)  When terminating a Tenancy either at-fault or no-fault, an Owner must comply with all of the following:

1) The Owner must serve a written notice in accordance with Civil Code sections 1946 through 1946.5, to the Tenant that states that, in addition to any information required by federal or State law, the Owner will terminate the Tenancy, and that indicates at least one at-fault or no-fault just cause reason as provided in section 8-3120(b); and

2) The Owner has not accepted and will not accept Rent or any other consideration in return for the continued use of the Residential Property beyond the term of the terminated Tenancy in compliance with *Civil Code* sections 1945 through 1946.5; and

3) The Owner qualifies the termination as at-fault or no-fault just cause, as specified in section 8-3120(b); and

4) The Owner has submitted to the City, within five (5) days after service of the notice of termination on the Tenant, a true and accurate copy of the Owner's written notice of termination, and proof of such service, signed under penalty of perjury, on the Tenant, through the City's Rental Registry portal. The Owner shall maintain proof of service to the City as evidence that the Owner has complied with this section.

5) The Owner must provide the notice in the language that the Owner and Tenant used to negotiate the terms of the Tenancy, in addition to English.

Section 8-3122 – Retaliatory Eviction and Anti-Harassment.

    (a)   Retaliatory Eviction.

          1)  If the main intent of the Owner in terminating a Tenancy or refusing to renew a Tenancy is retaliatory in nature, and if the Tenant is not in default as to the payment of Rent, then the Owner may not terminate the Tenancy or refuse to renew the Tenancy or cause the Tenant to quit involuntarily.

          2)  A Tenant may assert retaliation affirmatively or as a defense to the Owner's action regardless of the period of time which has elapsed between the Tenant's assertion or exercise of rights under this Article and the alleged act of retaliation.

          3)  Retaliation against a Tenant because of the Tenant's exercise of rights under this Article is prohibited. Retaliation claims may only be brought in court and may not be addressed administratively. A court may consider the protections afforded by this Article in evaluating a claim of retaliation.

   (b) Anti-Harassment.  No Owner, or any person, acting as a principal or agent, offering Residential Real Property for rent, or any contractor, subcontractor or employee of the Owner shall, with respect to Residential Real Property under any Rental Agreement or other Tenancy or estate at will, however created, do any of the following:

          1)  Interrupt, terminate, or fail to provide Housing Services required by Rental Agreement or by federal, State, County, or local housing, health, or safety laws, or threaten to do so, or violate or threaten to violate *Civil Code* section 789.3.

               A.  'Interrupt, terminate, or fail to provide Housing Services' in this provision does not include interruptions, terminations, or failure to provide Housing Services as a result of interruptions, outages, or terminations caused by events or actions outside of the Owner's control, such as utility outages caused by natural disaster.  Further, this provision does not include stoppages, outages, terminations, and interruptions properly noticed to Tenants as required by a signed Rental Agreement.

          2)  Take any of the following actions in bad faith:

               A.  Fail to perform repairs and maintenance required by Rental Agreement or by federal, State, or local laws;

B. Fail to exercise due diligence in completing repairs and maintenance once undertaken;

C. Fail to follow appropriate industry repair, containment, or remediation protocols designed to minimize exposure to noise, dust, lead, paint, mold, asbestos, or other building materials with potentially harmful health impacts;

D. Conduct elective renovation or construction of unit for the purpose of harassing a Tenant;

E. Refuse to acknowledge or accept receipt of a Tenant's lawful Rent payment as set forth in a Rental Agreement, by usual practice of the parties, or in a notice to pay Rent or quit;

F. Refuse to cash or process a Rent check or other form of acceptable Rent payment for over thirty (30) days after it is tendered;

G. Fail to maintain a current address for delivery of Rent payments;

H. Violate a Tenant's right to privacy without limitation, by requesting information regarding residence or citizenship status, protected class status, or social security number, except as required by law or in the case of a social security number, for the purpose of obtaining information for the qualifications for a Tenancy;

I. Release information protected by the Tenant's right to privacy except as required or authorized by law; or

J. Request or demand an unreasonable amount of information from Tenant in response to a request for reasonable accommodation.

3) Abuse the right of access into Residential Real Property as established by *Civil Code* section 1954 or other applicable law. This includes entries for inspections that are not related to necessary repairs or services; entries excessive in number; entries that improperly target certain Tenants or are used to collect evidence against the occupant or otherwise beyond the scope of an otherwise lawful entry; entries or demands for entry at times outside of normal business hours, unless for health and safety reasons or if the Tenant agrees otherwise; entries contrary to a Tenant's reasonable request to change the date or time of entry; photographing or otherwise recording portions of a Rental Unit

Ordinance No. NS-3027
Page 20 of 43

that are beyond the scope of lawful entry or inspection; and misrepresenting the reasons for accessing Residential Real Property.

4) Influence or attempt to influence a Tenant to vacate Residential Real Property through fraud, misrepresentation, intimidation or coercion, which shall include threatening to report a Tenant to the United States Department of Homeland Security.

5) Threaten the Tenant, by word or gesture, with physical harm, or abuse Tenant with words, either orally or in writing, which are offensive and inherently likely to provoke an immediate violent reaction. This includes words used during in-person conversations, through social media postings or messages, or other communications.

6) Violate any law which prohibits discrimination based on race, gender, sexual preference, sexual orientation, ethnic background, nationality, religion, age, parenthood, marriage, pregnancy, disability, human immunodeficiency virus (HIV)/ acquired immune deficiency syndrome (AIDS), occupancy by a minor child, or source of income.

7) Take action to terminate any Tenancy including service of any notice to quit or other eviction notice or bring any action to recover possession of a Rental Unit based upon facts which the Owner has no reasonable cause to believe to be true or upon a legal theory which is untenable under the facts known to the Owner. No Owner shall be liable under this subsection for bringing an action to recover possession unless and until the Tenant has obtained a favorable termination of that action.

8) Remove from the Rental Unit personal property, furnishings, or any other items without the prior written consent of the Tenant, except when done pursuant to enforcement of a legal termination of Tenancy.

9) Provide false written or verbal information regarding any federal, State, County, or local Tenant protections, including mischaracterizing the nature or effect of a notice to quit or other eviction notice. False information includes, without limitation, requesting or demanding a Tenant:

  A. Sign a new Rental Agreement not in the Tenant's primary language if:

    i. Rental Agreement negotiations were conducted in the Tenant's primary language;

    ii. The existing Rental Agreement is in the Tenant's primary language; or

Ordinance No. NS-3027<br>Page 21 of 43

        iii.    Owner is otherwise aware that the new Rental Agreement is not in Tenant's primary language.

    B. Enter into a Rent repayment plan if the Owner states, misrepresents, suggests, or implies, that the Tenant should or must do so to take advantage of Tenant protection laws that do not in fact require such plans.

10) Offer payments to:

    A. A Tenant to vacate more than once in six (6) months, after the Tenant has notified the Owner in writing that the Tenant does not desire to receive further offers of payments to vacate;

    B. Attempt to coerce Tenant to vacate accompanied with threats or intimidation. This shall not include settlement offers in pending eviction actions made in good faith and not accompanied with threats or intimidation.

11) Communicate with Tenant in a language other than Tenant's primary language for the purpose of intimidating, confusing, deceiving or annoying Tenant.

12) Interfere with a Tenant's right to quiet use and enjoyment of a Rental Unit as that right is defined by law.

13) Commit repeated acts or omissions of such significance as to substantially interfere with or disturb the comfort, repose, peace, or quiet of any person lawfully entitled to occupancy of such Rental Unit and that cause, are likely to cause, or are intended to cause any person lawfully entitled to occupancy of a Rental Unit to vacate such Rental Unit or to surrender or waive any rights in relation to such occupancy.

14) Remove a housing service for the purpose of causing the Tenant to vacate the Residential Real Property. For example, taking away a parking space knowing that a Tenant cannot find alternative parking and must move.

15) Interfere with the right of Tenants to organize as Tenants and engage in concerted activities with other Tenants for the purpose of mutual aid and protection; provide property access to Tenant organizers, advocates, or representatives working with or on behalf of Tenants living at a property; convene Tenant or Tenant organization meetings in an appropriate space accessible to Tenants under the terms of their Rental Agreement; or distribute and post literature informing other

Tenants of their rights and of opportunities to involve themselves in their project in common areas, including lobby areas and bulletin boards.

16) Threatening or intimidating a Tenant based on their immigration or citizenship status or otherwise disclosing a Tenant's immigration or citizenship status in violation of California Civil Code section 1940.35(a) and California Code of Civil Procedure section 1161.4, as may be amended.

## DIVISION 3. – RENT STABILIZATION

Section 8-3140 – Prohibited Increases.

(a) Increases in Rent on Residential Real Property or Mobilehome Spaces in the City of Santa Ana in excess of three percent (3%), or eighty (80%) of the change in the Consumer Price Index, whichever is less, and more than one Rent Increase in any twelve (12) month period, are prohibited, unless expressly exempt under the Costa-Hawkins Rental Housing Act codified in *California Civil Code* section 1954.50, et seq., or the Mobilehome Residency Law codified in *California Civil Code* sections 798, et seq. If the change in the Consumer Price Index is negative, no Rent Increase is permitted. The term Consumer Price Index means, at the time of the adjustment calculation completed by the City pursuant to subsection (b), the percentage increase in the United State Consumer Price Index for all Urban Consumers in the Los Angeles-Long Beach-Anaheim Metropolitan Area published by the Bureau of Labor Statistics, not seasonally adjusted, for the most recent twelve (12) month period ending prior to the City's calculation pursuant to subsection (b). A violation of this section occurs upon the service of notice or demand for a prohibited increase in Rent.

(b) No later than June 30 each year, beginning with the year 2022, the City shall announce the amount of allowable Rent Increase based on subsection (a) herein, which shall be effective as of September 1 of that year.

Section 8-3141 – Reasonable Rate of Return.

This ordinance allows for an annual adjustment of Residential Real Property or Mobilehome Space Rent of up to three percent (3%), or eighty (80%) of the change in the Consumer Price Index, whichever is less. A Consumer Price Index-based increase is found and determined to provide a just and reasonable return on an Owner's property, and has been adopted to encourage good management, reward efficiency, and discourage the flight of capital, as well as to be commensurate with returns on

comparable investments, but not so high as to defeat the purpose of curtailing excessive Rents and rental increases.  Notwithstanding the foregoing, however, any Owner of Residential Real Property or a Mobilehome Park who contends that the limit on rental increases set forth in Section 8-3140 above will prevent the Owner from receiving a fair and reasonable return on their property may petition for relief from the cap set forth in section 8-3140 pursuant to the procedures set forth in this Division.

Section 8-3142 -- Fair Return Petition for Rent Increase.

(a)     A Landlord may submit a Fair Return Petition to the Program Administrator in accordance with the procedures set forth in this Division requesting a Rent Increase in excess of that provided in this Division in order to obtain a fair and reasonable return on the Rental Unit.

(b)     Standard of Review.  All relevant factors shall be considered when evaluating a Fair Return Petition, including, but not limited to, the following:

1)    Changes in the Consumer Price Index for All Urban Consumers in the Los Angeles-Long Beach-Anaheim Metropolitan Area published by the Bureau of Labor Statistics;

2)    The Rent lawfully charged for comparable Rental Units in the City;

3)    The length of time since the last determination on a Fair Return Petition, or the last Rent Increase if no previous Fair Return Petition has been made;

4)    The completion of any rehabilitation work related to the Rental Unit, and the cost thereof, including materials, labor, construction interest, permit fees, and other items deemed appropriate;

5)    Changes in property taxes or other taxes related to the Rental Unit;

6)    Changes in the Rent paid by the Landlord for the lease of the Rental Unit;

7)    Changes in the utility charges for the Rental Unit paid by the Landlord, and the extent, if any, of reimbursement from the Tenants;

8)    Changes in reasonable Operating Expenses;

9)    Changes in Net Operating Income;

10)   The need for repairs caused by circumstances other than ordinary wear and tear;

11)   The amount and quality of Housing Services provided by the Landlord to the Tenants;

12)   Compliance with any existing Rental Agreement lawfully entered into between the Landlord and Tenants; and

13)   Landlord's substantial compliance with this Article and applicable housing, health and safety codes.

Section 8-3143 -- Capital Improvement Petition

(a)     Effective July 1, 2023, or as modified by resolution of the City Council, a Landlord may submit a Capital Improvement Petition to the Program Administrator in accordance with the procedures set forth in this Division requesting a pass-through cost to the Tenants to cover expenses incurred by the Landlord to complete Capital Improvements for the Rental Unit pursuant to the following provisions:

1)     The Capital Improvement was paid for and completed after November 19, 2021 (the effective date of the first adopted Rent Stabilization Ordinance);

2)     The Capital Improvement was paid for and completed prior to the filing of the Capital Improvement Petition;

3)     A Capital Improvement Petition must be initiated by the Landlord within two (2) years of completion of the Capital Improvement;

4)     A Capital Improvement Petition shall not apply to Rental Units or new Tenants whose initial Rent was established after the Landlord completed the Capital Improvement;

5)     The Landlord may not require a Tenant to pay any amount of any cost that is attributable to any period of time that the Tenant was not entitled to use and occupy the Rental Unit;

6)     The Landlord may not require a Tenant to pay more than the Tenant's share of the cost attributable to that Tenant's Rental Unit that is permitted to be passed through to the Tenant;

7)     If the Capital Improvement inures solely to the benefit of one or more of the Rental Units, but to less than all, the surcharge shall be so annualized, but shall be applied and/or prorated only with respect to the one or more Rental Units actually so benefited;

8)     Equipment otherwise eligible as a Capital Improvement will not be considered if a "use fee" is charged (i.e. -- coin operated washer and dryers); and,

9)     Pass through costs for Capital Improvements shall not be considered Rent and shall not be increased when Rent Increases, nor shall they be considered Rent for purposes of calculating a Rent Increase.

(b)     Calculating Capital Improvements.  Any Capital Improvement pass-through cost must be calculated according to the following:

1)     Capital Improvement costs must be amortized over the useful life of the Capital Improvement, not to exceed ten percent (10%) of the current Rent; for the purposes of such computation, the current Rent for any time period shall not include any Capital Improvement pass-through amounts;

Ordinance No. NS-3027
Page 25 of 43

2)     For mixed-use structures and Landlord-occupied Rental Units, only the percent of residential square footage will be applied in the calculations;

3)     If a unit is occupied by an agent of the Landlord, this unit must be included when determining the average costs per Rental Unit; and,

4)     If the Landlord is reimbursed for Capital Improvements (i.e. – insurance, court-awarded damages, subsidies, etc.), such reimbursement must be deducted from the Capital Improvements before costs are amortized and allocated among the Rental Units.

(c)     Standard of review.  All relevant factors shall be considered when evaluating a Capital Improvement Petition, including the following:

1)     Capital Improvement completed;

2)     Landlord's Petition made within two (2) years of completion of Capital Improvement;

3)     Distinguished from ordinary repair or maintenance;

4)     For the primary benefit, use, and enjoyment of the Tenant;

5)     Permanently fixed in place or relatively immobile and appropriated to the use of the Rental Unit;

6)     No "use fee" or other charge imposed on Tenants for its use; and,

7)     Cost-factored and amortized.

Section 8-3144 – Tenant Petition

(a)     Effective July 1, 2023, or as modified by resolution of the City Council, a Tenant may submit a Petition to the Program Administrator in accordance with the procedures set forth in this Division on any one (1) or more of the following grounds:

1)     To request review of a Rent Increase in excess of the maximum allowed Rent Increase;

2)     To request a reduction in Rent based on decreased Housing Services;

3)     To request a reduction in Rent based on failure of the Landlord to maintain a habitable premises, including health, safety, fire, or building code violations;

4)     To contest a Capital Improvement cost as an unauthorized or excessive pass through; or,

5)     For any other violation of this Article by the Landlord.

(b)     Tenant's time to file a Petition. Where applicable, a Tenant filing a Petition under this Division shall do so within the following time limits:

1)    Tenant receiving a notice of Rent Increase shall have thirty (30) days after service of such notice to file a Petition for review of Rent;

2)    In instances where notice is not provided as required, the Tenant shall file a Petition for review of Rent within thirty (30) days after Tenant knew of the alleged failure to comply with the requirements of this Article; and,

3)    For any other violation(s) of this Article by the Landlord, the Tenant shall file a Petition within one hundred and eighty (180) days of the alleged violation(s).

(c)    Standard of Review.  All relevant factors shall be considered when evaluating a Tenant Petition, including the following:

1)    Landlord allows violations of this Article or other applicable state and local statutes to persist;

2)    Any reduction of Housing Services, living space, or amenities;

3)    Substantial deterioration of the Rental Unit other than as a result of ordinary wear and tear;

4)    Landlord's failure to provide adequate Housing Services;

5)    Tenant provided Landlord with reasonable notice and opportunity to correct the conditions that provide the basis for the petition; and,

6)    Landlord's failure to comply substantially with this Article or applicable housing, health and safety codes.

(d)    Restoration of Rent Decrease. Where a Rent decrease has been ordered pursuant to this Division due to a decrease in Housing Services or failure to maintain habitability, the amount of Rent decreased (return of excess Rent) may be restored in accordance with procedures set out in the regulations when the former Housing Services or maintenance levels are reinstated.

Section 8-3145 – Petition Process

A Landlord or a Tenant may file Petitions with the Program Administrator, as provided in this Division. For purposes of this Petition process, the Landlord and each Tenant of a Rental Unit that is the subject of a Petition shall be a "party" to the Petition. The Program Administrator shall promulgate regulations regarding procedures for Petitions filed under this Article. Petitions shall be governed by such regulations and by the provisions of this Section.  Petitions shall be available in the language that the Owner and Tenant used to negotiate the terms of the Tenancy (e.g., Spanish, Chinese, Tagalog, Vietnamese and Korean), as well as English.

(a)    Filing Petition.  Upon the filing of a Petition, the Program Administrator shall notify the petitioner of the acceptance or denial of the Petition based on the

completeness of the submission. The Program Administrator shall not assess the merits of the Petition, and shall only refuse acceptance of a Petition that does not include required information or documentation or comply with the requirements of this Division.

(b)    Filing Fee. Fees for the filing of any Petition shall be established by City Council resolution in the City's Miscellaneous Fee Schedule.

(c)    Prior Petition. Notwithstanding any other provision of this Division, no Petition shall proceed if a decision has been made with regard to a prior Petition based on the same or substantially the same grounds within the previous one hundred and eighty (180) days.

(d)    No Landlord Petition or upward adjustment of Rent shall be authorized under this Division if the Landlord:

   1)    Has continued to fail to comply, after order of the Board, with any provisions of this Article and/or orders or regulations issued thereunder by the Board; or,

   2)    Has failed to bring the Rental Unit into compliance with the implied warranty of habitability.

(e)    Notice of Petition. As soon as possible after acceptance of a Petition, the Program Administrator shall provide written notice to the Landlord, if the Petition was filed by the Tenant, or the Tenant, if the Petition was filed by the Landlord, of the receipt of such a Petition. The written notice shall inform the parties of the Petition process, the right to respond, and include a copy of the completed Petition and supportive documents. Any response submitted by the responding party will be made available to the petitioning party.

(f)    Hearing Officer. An impartial Hearing Officer appointed by the Program Administrator shall conduct a hearing to act upon the Petition. The Hearing Officer has the following powers:

   1) To make a determination on a Petition; and
   2) Any other powers delegated to the Hearing Officer by the Board.

(g)    Board Action in Lieu of Reference to Hearing Officer. The Board, on its own motion, in the Board's sole discretion, may hold a hearing on a Petition without the Petition first being heard by a Hearing Officer.

(h)    Time of Hearing. Each accepted Petition shall be scheduled for a hearing by the Hearing Officer to be held on a date not more than sixty (60) days from the date the Program Administrator accepts the Petition. With agreement of the parties, the Hearing Officer may hold the hearing beyond the sixty (60) days. In no event later than ten (10) days prior to the hearing, the Hearing Officer shall notify all parties as to the time, date, and place of the hearing.

Ordinance No. NS-3027
Page 28 of 43

(i)     Consolidation.  All Landlord Petitions pertaining to Tenants in the same building shall be consolidated for hearing, and all Petitions filed by Tenants occupying the same building shall be consolidated for hearing, unless the Program Administrator or Hearing Officer finds good cause not to consolidate such Petitions.

(j)     Right of Assistance.  All parties to a hearing may have assistance in presenting evidence and developing their position from attorneys, legal workers, or any other persons designated by said parties.

(k)     Rules of Evidence.  Formal rules of evidence shall not be applicable to hearings on Petitions.  At such a hearing, the parties may offer any documents, testimony, written declarations, or other evidence that, in the opinion of the Hearing Officer, is credible and relevant to the Petition. The Hearing Officer may consider the results of inspections of the property in question and the results of any other investigations conducted by or at the request of the Hearing Officer or Program Administrator.  Evidence unduly repetitious, lacking credibility, or irrelevant evidence shall be excluded upon order by the Hearing Officer.

(l)     Evidence.  Any party may appear and offer such documents, testimony, written declarations, or other evidence as may be pertinent to the proceeding.  The Hearing Officer may require either party to a Petition to provide any books, records, or papers deemed pertinent, in addition to that information contained in the Petition and Rental Registry.  The Hearing Officer may request the City to conduct a current building inspection if the Hearing Officer finds good cause to believe the current information does not reflect the current condition of the Rental Unit.  All documents required under this section shall be made available to the parties involved prior to the hearing.  In cases where information filed in a Petition or in additional submissions filed at the request of the Hearing Officer is inadequate or false, no action shall be taken on said Petition until the deficiency is remedied.

(m)     Quantum of Proof.  The party who files the Petition shall have the burden of proof.  No Petition shall be granted unless supported by the preponderance of the evidence submitted at the hearing.

(n)     Time for Decision.  The policies and procedures adopted by the Board shall provide for final action on any Petition within a reasonable time.

(o)     Notice of Decision. The Hearing Officer shall make a determination on the merits of the Petition and shall provide a written statement of decision, including findings upon which the determination is based.  The Hearing Officer's decision on a Petition may be reasonably conditioned in any manner necessary to effectuate the purposes of this Article.  Additionally, the parties to the hearing shall also be notified of their right to any appeal allowed by the Board and/or to judicial review of the decision pursuant to this Division.

(p)     Hearing Record.  The record of the hearing shall include: the Petition; all exhibits, papers, and documents required to be filed or accepted into evidence during the proceedings; a list of participants present; a summary of all testimony accepted in the proceedings; a statement of all materials officially noticed; all recommended decisions, orders and/or rulings; all final decisions, orders and/or rulings; and the reasons for each final decision, order and/or ruling.  All hearings shall be recorded.

(q)     Appeal.  Any person aggrieved by the decisions of the Hearing Officer may appeal to the Board.  An appeal to the Board shall be filed no later than thirty (30) days after receipt of the notice of the decision of the Hearing Officer.  On appeal, the Board shall affirm, reverse, or modify the decision of the Hearing Officer.  Unless the Board elects to conduct a de novo hearing, Board review of the Hearing Officer's decision shall be based on the hearing record without holding a new hearing.  The Board may consider additional evidence for good cause, including evidence which did not exist at the time of the hearing or which could not be discovered using due diligence by a party.  If no Board exists, any appeal of the Hearing Officer decision on a Petition shall proceed pursuant to the administrative appeal procedures found in Chapter 3 of the Santa Ana Municipal Code.

(r)     Finality of Decision.  The decision of the Hearing Officer shall be the final decision of the Board in the event of no appeal to the Board.  The decision of the Hearing Officer shall not be stayed pending appeal; however, in the event that the Board on appeal reverses or modifies the decision of the Hearing Officer, the Board shall order the appropriate party to make retroactive payments, as applicable, to restore the parties to the position they would have occupied had the Hearing Officer's decision been the same as that of the Board.


Section 8-3146 – Voluntary Mediation

(a)     Voluntary mediation services shall be provided by the City. Upon request, the Program Administrator shall appoint a Mediator and set a date for a mediation no later than thirty (30) days after the acceptance of the subject Petition, unless the Program Administrator determines that additional time is required under the circumstances.  The Program Administrator shall notify the Landlord and Tenant(s) in writing of the date, time, and place of the mediation hearing at least ten (10) days prior to the mediation.  This notice shall be served either in person or through ordinary mail or electronic correspondence.

(b)     It is the intent and purpose of mediation to provide a process in which Mediators may assist disputants in reaching a voluntary agreement. Accordingly, except as otherwise expressly provided herein, there shall be no penalty or disability, either civil or criminal, for failure to participate in the mediation process, and there shall be no penalty, either civil or criminal, for failure to reach agreement with a disputant in the mediation process.

(c)     Mediation is a voluntary collaborative process wherein the Landlord and Tenant(s) who have a disagreement can develop options, consider alternatives, and develop a consensual agreement.  The role of the Mediator is to facilitate open communication to resolve a dispute in a non-adversarial and confidential manner.

(d)     If the Landlord and Tenant agree to a resolution, the Mediator may assist the parties in preparing a written settlement agreement for the signature of the Landlord and the Tenant, provided that in doing so the Mediator confines the assistance to stating the settlement as determined by the parties.  Such agreement shall constitute a legally enforceable contract.

(e)     Should the parties fail to agree to a resolution, or the Mediator determines that the parties have reached an impasse, the Mediator may refer the Petition back to the Program Administrator to continue the Petition review process detailed in this Division.

(f)     All documents and results related to mediations and facilitations held pursuant to this Article shall be kept confidential and shall be inadmissible as evidence in any subsequent administrative or judicial proceeding.

(g) The Mediator and/or Program Administrator shall provide documentation and translation services in the language that the Owner and Tenant used to negotiate the terms of the Tenancy (e.g., Spanish, Chinese, Tagalog, Vietnamese and Korean), as well as English.


Section 8-3147 – Exemptions.

(a)     Pursuant to the Costa-Hawkins Rental Housing Act, the provisions of this ordinance regulating the amount of Rent that a Residential Real Property Owner may charge shall not apply to the following: any Residential Real Property that has a certificate of occupancy issued after February 1, 1995 (*California Civil Code* section 1954.52(a)(1)); and, any other provisions of the Costa-Hawkins Rental Housing Act addressing exemptions, as applicable.

(b)     Pursuant to the Mobilehome Residency Law, the provisions of this ordinance regulating the amount of Rent that a Mobilehome Park Owner may charge for a Mobilehome Space shall not apply to the following: any Mobilehome Space subject to a long term (more than one year) Rental Agreement (*California Civil Code* section 798.17); any newly constructed Mobilehome Space first offered for rent on or after January 1, 1990 (*California Civil Code* section 798.45); Mobilehomes not being used as a person's primary residence that are not being leased to someone else (*California Civil Code* section 798.21); and, any other provisions of the Mobilehome Residency Law addressing exemptions, as applicable.

(c)      Pursuant to the Tenant Protection Act of 2019, *Civil Code* section 1947.12(d), the provisions of this ordinance regulating the amount of Rent that a Residential Real Property Owner may charge shall not apply to the following:

(1)   Housing restricted by deed, regulatory restriction contained in an agreement with a government agency, or other recorded document as affordable housing for persons and families of very low, low, or moderate income, as defined in Section 50093 of the Health and Safety Code, or subject to an agreement that provides housing subsidies for affordable housing for persons and families of very low, low, or moderate income, as defined in Section 50093 of the Health and Safety Code or comparable federal statutes.

(2)   Dormitories owned and operated by an institution of higher education or a kindergarten and grades 1 to 12, inclusive, school.

(3)   Housing that has been issued a certificate of occupancy within the previous 15 years.

(4)   Residential Real Property that is alienable separate from the title to any other dwelling unit, provided that both of the following apply:

A. The Owner is not any of the following:

i. A real estate investment trust, as defined in section 856 of the Internal Revenue Code.

ii. A corporation.

iii. A limited liability company in which at least one member is a corporation.

B.

i. The Tenants have been provided written notice that the Residential Real Property is exempt from this section using the following statement:

"This property is not subject to the Rent limits imposed by Santa Ana Municipal Code section 8-3140 and the Owner is not any of the following: (1) a real estate investment trust, as defined by section 856 of the Internal Revenue Code; (2) a corporation; or (3) a limited liability company in which at least one member is a corporation."

        ii.  For a Tenancy existing before the effective date of this ordinance, the notice required under clause (i) may, but is not required to be provided in the Rental Agreement.

        iii.  For a Tenancy commenced or renewed on or after the effective date of this ordinance, the notice required under clause (i) must be provided in the Rental Agreement.

    (5)    A property containing two separate dwelling units within a single structure in which the Owner occupied one of the units as the Owner's principal place of residence at the beginning of the Tenancy so long as the Owner continues in occupancy, and neither unit is an accessory dwelling unit or a junior accessory dwelling unit.

Section 8-3148 – Rent Increase Ineffective.

No Rent Increase shall be effective if the Owner:

(a)    Fails to substantially comply with all provisions of this Division, including but not limited to the failure to provide notices as required; or

(b)    Fails to maintain the Residential Real Property or Mobilehome Space in compliance with California Civil Code Sections 1941.1 et seq. and California Health and Safety Code sections 17920.3 and 17920.10, except as to Mobilehomes and Mobilehome Spaces in Mobilehome Parks that are subject to the Mobilehome Parks Act, Health and Safety Code section 18200, et seq.; Manufactured Housing Act, Health and Safety Code section 18000, et seq.; or the National Manufactured Housing Construction and Safety Standards Act of 1974, 42 U.S.C. sections 5401, et seq., as applicable; or

(c)    Fails to make repairs ordered by the City or court of competent jurisdiction.

(d)    No Rent Increases shall take effect for any Rental Unit unless the Landlord has accurately completed the Rental Unit Registration.

Section 8-3149 – Notice Requirements.

(a)    An Owner of any Residential Real Property or Mobilehome Space subject to this provision shall, on or before the date of commencement of a Tenancy, give the Tenant a written notice in a form prescribed by the City which must include the following information:

(1)     The existence and scope of this Division 3 of Article XIX of Chapter 8 of the Santa Ana Municipal Code; and

(2)     The Tenant's right to respond to any Fair Return or Capital Improvement Petition filed with the City by the Owner pursuant to this Division.

(b)     As part of any notice to increase Rent, an Owner must include:

(1)     Notice of the existence of this Division 3 of Article XIX of Chapter 8 of the Santa Ana Municipal Code; and

(2)     The Tenant's right to respond to any Fair Return or Capital Improvement Petition filed with the City by the Owner pursuant to this Division, unless such Rent Increase is pursuant to an approved Fair Return Petition.

(3)     No Rent Increase shall take effect until the requirements of this Division have been met.

(c)     The Owner must give notices to the Tenant in the language that the Owner and Tenant used to negotiate the terms of the Tenancy (e.g., English, Spanish, Chinese, Tagalog, Vietnamese, and Korean) as well as English.

(d)     Any notices or documents required to be provided from a Landlord to a Tenant by this Article or any other federal, state, or local law, including, but not limited to, notice of Rent Increase and notice of eviction, shall be provided to the City through the Rental Registry portal.

DIVISION 4. – RENTAL REGISTRY AND RENTAL REGISTRY FEE

Section 8-3160 – Rental Registry

Effective July 1, 2023, or as modified by resolution of the City Council, the City shall create a Rental Registry and all Landlords with Rental Units in the City of Santa Ana shall complete and submit Registration Forms for each Rental Unit pursuant to the following:

(a)     Initial Registration. A Landlord must file an initial Registration Form with the City for each Rental Unit that is subject to the provisions of this Article. Registration of a Rental Unit shall not be complete until an Owner has:

1)     Completely and accurately provided a Registration Form; and,
2)     Paid all fees owed to the City with respect to the Rental Unit including Registration Fees imposed pursuant to this Article.

(b)    Change of Ownership or Management.

    1)    Whenever a change in ownership of a Rental Unit occurs, the Landlord shall provide the City with written notice of the change in ownership, including the date of transfer, and the name, address and contact information of the new Owner, within thirty (30) days of the close of escrow.

    2)    The new Owner is required to file a Registration Form with the City within sixty (60) days of such change. The new Owner's Registration Form will only be accepted by the City if it is accompanied by a copy of a written notification on a form prescribed by the Program Administrator from the Landlord to all Tenants advising the Tenants of the change in ownership of the building and setting forth the name, address and contact information of the new Owner and of the new Owner's property manager or representative, and a declaration that the new Owner served the written notification on all the Tenants.

    3)    Registration amendments also shall be required to be filed with the City within sixty (60) days of a change of the property management or authorized agent or if the address of the Owner or authorized agent changes.

(c)    Re-Registration Following a Vacancy. A Landlord shall, in the manner described herein, re-register a Rental Unit with the City within thirty (30) days after a vacancy has occurred and the Rental Unit is re-rented.

(d)    Claim of Exemption. Any Landlord that is claiming any exemption from this Article must file a claim of exemption with the City. The Landlord shall provide the City, on a form approved by the Program Administrator and accompanied by supporting documentation, a written declaration stating the facts which support the claim of exemption from the provisions of this Article. If the written declaration and supporting documents are not submitted by July 1 of each year for any Rental Unit, that Rental Unit shall be deemed to be subject to the provisions of this Article. If the Board determines that any Unit was incorrectly registered as exempt due to any affirmative misrepresentation by the Owner, the exemption for that Unit may be revoked retroactively, and the Unit will be subject to any applicable enforcement measures.

(e)    Termination of Exemption. Any time a Rental Unit that has been exempted under the provisions of this Article loses its exempt status due to termination of the conditions qualifying it for exemption, the Landlord of such Rental Unit is required to file a Registration Form for said Rental Unit within thirty (30) days of the change in status.

(f)    Annual Requirement. For the subsequent years after the initial Registration date, each Registration Form and claims of exemption(s) must be annually

filed on or before July 1 of each year.  The Rental Housing Board may modify the annual registration date.

(g)    Contents of Registration Form. The Rental Registration Form shall completely and accurately provide the following information from the Landlord for each Rental Unit as of the date of filing the Registration Form:

1)    Address of each Rental Unit including identifying number or letter;
2)    Number of bedrooms and bathrooms in the Rental Unit;
3)    Name, current address, and contact information of current Owners, authorized representatives and property managers;
4)    Date of assumption of ownership by current Owners;
5)    Current Rent;
6)    Date and amount of last Rent Increase; and
7)    Move-in date of current Tenant(s).

The Board and/or Program Administrator may adopt policies and procedures that require additional information to be collected and recorded in Registration Forms in furtherance of the objectives of this Article.

(h)    Affidavit. All Rental Registration Forms provided by Landlords in accordance with this Division shall include an affidavit signed by the Landlord declaring under penalty of perjury that the information provided in the Rental Registration Form is true and correct.

(i)    Notices.  Any notices or documents required to be provided from a Landlord to a Tenant by this Article or any other federal, state, or local law, including, but not limited to, notice of Rent Increase and notice of eviction, shall be provided to the City through the Rental Registry portal.

(j)    Proper Registration. Registration of a Rental Unit shall not be complete until the Landlord has:

1)    Paid all fees and penalties owed to the City with respect to the Rental Unit, including the Rental Registry Fee, imposed pursuant to this Article; and,
2)    Filed a complete and accurate Registration Form for that Rental Unit including all information required by this Division and any policies and procedures adopted by the Board and/or Program Administrator.

(k)    Commencing October 1, 2023, the City may commence enforcement against any Landlord who fails to register a Rental Unit, or provide current and accurate data regarding a Rental Unit, according to this Division.  Furthermore, no Landlord shall advertise for rent, demand or accept Rent for a Rental Unit, or evict any Tenant from a Rental Unit, if the Rental Unit Registration is not complete and accurate.  In addition, no

petition, application, claim or request, and no Rent increases shall take effect for any Rental Unit unless the Landlord has accurately completed the Rental Unit Registration.

Section 8-3161 – Rental Registry Fee

Effective July 1, 2023, or as modified by resolution of the City Council, an annual Rental Registry Fee shall be imposed on each Rental Unit in the City. All Landlords with Rental Units that are subject to this Article shall pay the Rental Registry Fee as established by the City Council. The Rental Registry Fee is to fund the City's cost to implement, administer, monitor, support, and enforce the provisions of this Article.

(a)     Amount of Fee. A Landlord shall pay to the City a Rental Registry Fee for each of the Landlord's Rental Units in the City. The amount of the Fee shall be determined by resolution of the City Council adopted from time to time and set forth in the City's Miscellaneous Fee Schedule. The Fee shall not exceed the amount found by the City Council to be necessary to administer the provisions of this Article, and the City Council's findings in this regard shall be final.

(b)     Deadline for Landlord Payment of Rental Registry Fee. Annual Rental Registry Fees shall be due and owing on July 1 each year, or within thirty (30) calendar days of any subsequent changes to the Rental Unit.

(c)     Late Payment. Any Landlord responsible for paying the Rental Registry Fee who fails to pay the Fee by October 1, or within sixty (60) calendar days of any mid-year due date, will be delinquent and shall, in addition to the Fee, pay additional late charges, penalties of assessments as determined by resolution of the City Council. The amount of Rental Registry Fee and any penalty imposed by the provisions of this Article shall be deemed a debt to the City.

(d)     Pass Through to Tenants. After timely payment of the Rental Registry Fee, the Landlord may pass through up to fifty percent (50%) of the Fee to Tenants of the applicable Rental Unit, to be paid by the Tenant in twelve (12) equal monthly installments. The Fee pass-through shall not be considered part of the Rent in calculating any Rent Increase. If a Landlord fails to timely pay the Fee and becomes delinquent, neither the Fee nor any penalties can be passed through to the Tenant. In the event a Tenant paid Registration Fee pass-through costs in excess of that permitted by this Division, the Landlord shall reimburse the Tenant for the Registration Fee pass-through cost overpayment.

1)     No Pass-Through for Subsidized Tenants. No portion of the Registration Fee may be passed through to Tenants who reside in housing restricted by deed, regulatory restriction contained in an agreement with a government agency, or other recorded document as affordable housing for persons and families of very low, low, or moderate income, as defined in Section 50093 of the Health and

Safety Code, or subject to an agreement that provides housing subsidies for affordable housing for persons and families of very low, low, or moderate income, as defined in Section 50093 of the Health and Safety Code or comparable federal statutes.

Section 8-3162 – Education and Outreach.

The Program Administrator shall have the authority to contract with community-based organizations for them to assist in the education and outreach related to this Article.

DIVISION 5. – RENTAL HOUSING BOARD

Section 8-3180 – Rental Housing Board

There is hereby created and established a Rental Housing Board to perform the functions designated in this Article. The composition of the Board and selection of Board Members shall be based upon the following:

(a)  Membership of Board. The Rental Housing Board shall consist of seven (7) Board Members. Each City Councilmember shall appoint one (1) Board Member, to be approved by the City Council, in an equitable order based upon a random lottery process. The Board Members of the Rental Housing Board shall be comprised of:

1)  Three (3) Tenants, including at least one (1) Mobilehome Tenant;
2)  Two (2) Landlords; and
3)  Two (2) at-large Members with no financial interest in and no ownership of income-generating rental housing.

(b)  Chairperson. The Board shall elect annually one of its Members to serve in the capacity as Chairperson.

(c)  Eligibility. Residents of the City are eligible to serve as members of the Board.

(d)  Full Disclosure of Holdings. Nominees for the position of Board Member shall submit a verified statement listing all of their interests and dealings in real property, including, but not limited to, ownership, sale or management of real property during the previous three (3) years. The Board may promulgate additional regulations.

(e)  Conflict of Interest. Board Members shall be subject to the requirements of the California Political Reform Act and other applicable state and local conflict of interest codes. Accordingly, a Board member shall be disqualified from participating in any hearing on an application, petition, or appeal where the Board Member is either the

Ordinance No. NS-3027
Page 38 of 43

Landlord or a Tenant residing at the subject property, or has any other form of conflict of interest.

      (f)    Training Required. All Board members shall attend training as designated by the Program Administrator.

Section 8-3181 – Rental Housing Board Member Term and Compensation

      (a)    Term.  Board Members shall serve for a term of four (4) years or until their respective successors are appointed or qualified, but in no event shall any persons be eligible for reappointment who has served three (3) consecutive terms of four (4) years each, irrespective of what seat or seats the Board Member is appointed to by the City Council.  However, the City Council may remove a Board Member at any time for any reason.

      (b)    Compensation.  Fifty dollars ($50.00) per meeting, plus fifty dollars ($50.00) per month automobile allowance.

Section 8-3182 – Rental Housing Board Powers and Duties

      (a)    The Rental Housing Board shall have the following powers and duties:

            1)    To hold regular meetings at least once each calendar month, or as needed, as fixed by the by-laws of the Board.

            2)    Conduct hearings on petitions, applications, and appeals of hearings determined by a Hearing Officer submitted by Landlords or Tenants under this Article.  Any fees for such hearings shall be established by City Council resolution in the City's Miscellaneous Fee Schedule.

            3)    Promulgate and implement policies and procedures for the administration and enforcement of this Article.  Make such studies, surveys, and investigations, conduct such hearings, and obtain such information as is necessary to carry out its powers and duties.

            4)    Review and assess yearly that sufficient number of staff are employed, including a Program Administrator, Hearing Officers, housing counselors and legal staff, as may be necessary to perform its function efficiently in order to fulfill the purpose of this Article.

            5)    Any other duties as necessary to administer and enforce this Article.

            6)    Such other duties as are designated by resolution of the City Council.

Section 8-3183 – Rental Housing Board Policies and Procedures

The Board shall issue and follow such policies and procedures, including those which are contained in this Article, as will further the purposes of the Article.

Section 8-3184 – Rental Housing Board Meetings

(a)     The Board shall hold such regularly scheduled meetings as are necessary to ensure the timely performance of its duties under this Article.  All regular and special meetings shall be called and conducted in accordance with state law.

(b)     Quorum. Four (4) members of the Board shall constitute a quorum for the transaction of business.

(c)     Voting. The affirmative vote of four (4) members of the Board is required for a decision, including all motions, rules, regulations, and orders of the Board.

Section 8-3185 – Judicial Review

Any decision of the Rental Housing Board shall be final unless judicial review is sought in a court of competent jurisdiction within thirty (30) days of the date of the Board's decision.  The Board decision shall take effect immediately unless provided otherwise in the decision, regardless of whether a party seeks judicial review.

DIVISION 6. – ENFORCEMENT AND REMEDIES

Section 8-3200 – Violations

(a)     It shall be unlawful for any person to violate or fail to comply with any provision of this Article.  The violation of any provision of this Article shall first be punished through the use of an administrative citation, as provided in Santa Ana Municipal Code section 1-21, et seq., prior to prosecution as a misdemeanor or infraction, as provided in Santa Ana Municipal Code section 1-8.

(b)     Civil Action.  Any aggrieved person, including the City and the People of the State of California, may bring a civil action for damages for any violation of this Article or the rules, regulations, orders and decisions of the Rental Housing Board.  The burden of proof in such cases shall be by a preponderance of the evidence.  No administrative remedy need be exhausted prior to filing a civil suit pursuant to this section.

(c)     Injunctive Relief.  Any person who commits an act, proposes to commit an act, or engages in any pattern and practice that violates this Division, or the policies, procedures, regulations, rules, orders and decisions of the Rental Housing Board, may be enjoined therefrom by any court of competent jurisdiction.  An action for injunction

Ordinance No. NS-3027
Page 40 of 43

under this section may be brought by any aggrieved person, including the City and People of the State of California. No administrative remedy need be exhausted prior to filing an action for injunctive relief pursuant to this section.

(d)    Affirmative Defense. A Landlord's failure to comply with any requirement of this Article may be asserted as a complete affirmative defense in an unlawful detainer or any other action brought by the Landlord to recover possession of the Rental Unit. Additionally, any attempt to recover possession of a Rental Unit in violation of this Article shall render the Landlord liable to the Tenant for damages in a civil action for wrongful eviction. The prevailing party in an action for wrongful eviction shall recover costs and reasonable attorneys' fees.

(e)    Public Nuisance. In addition to other penalties provided by law, any condition caused or permitted to exist in violation of any provision of this Article shall be deemed a public nuisance and may be summarily abated as such by the City, and each day such condition continues shall constitute a new and separate offense.

(f)    Non-Exclusive. The remedies provided in this Article are not exclusive, and nothing in this Article shall preclude any person from seeking any other remedies, penalties or procedures provided by law, nor is exhaustion of remedies under this section a prerequisite to the assertion of any other such right.

Section 4.    The City Council finds and determines that this Ordinance is not subject to the California Environmental Quality Act (CEQA) pursuant to sections 15060(c)(2) and 15060(c)(3) of the State CEQA Guidelines because it will not result in a direct or reasonably foreseeable indirect physical change in the environment, as there is no possibility it will have a significant effect on the environment and it is not a "project," as defined in section 15378 of the State CEQA Guidelines. Furthermore, the proposed Ordinance falls within the "common sense" CEQA" exemption set forth in CEQA Guidelines section 15061(b)(3), excluding projects where "it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment."

Section 5.    If any section, subsection, sentence, clause, phrase, or portion of this Ordinance is for any reason held to be invalid or unconstitutional by the decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance. The City Council of the City of Santa Ana hereby declares that it would have adopted this Ordinance and each section, subsection, sentence, clause, phrase or portion thereof irrespective of the fact that any one or more sections, subsections, sentences, clauses, phrases, or portions be declared invalid or unconstitutional.

Section 6.    This Ordinance shall become effective thirty (30) days after its adoption.

Section 7.    The Clerk of the Council shall certify to the adoption of this Ordinance and cause the same to be published in the manner prescribed by law.

ADOPTED this 18th day of October, 2022.

_____
Vicente Sarmiento
Mayor


APPROVED AS TO FORM:
Sonia R. Carvalho, City Attorney

_____
Ryan O. Hodge
Assistant City Attorney


AYES:            Councilmembers:   Hernandez, Lopez, Phan, Sarmiento (4)

NOES:            Councilmembers:   Mendoza, Penaloza, Bacerra (3)

ABSTAIN:         Councilmembers:   None (0)

NOT PRESENT: Councilmembers:   None (0)


Ordinance No. NS-3027
Page 42 of 43

CERTIFICATE OF ATTESTATION AND ORIGINALITY

I, Clerk of the Council, do hereby attest to and certify that the attached Ordinance No. NS-3027 to be the original ordinance adopted by the City Council of the City of Santa Ana on October 18, 2022 and that said ordinance was published in accordance with the Charter of the City of Santa Ana.

Date:   10/20/22

&c Clerk of the Council
City of Santa Ana